UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

KENDRA L. DWYER,

  *Plaintiff-Appellant,*

v.

METROPOLITAN LIFE INSURANCE
COMPANY,

  *Defendant-Appellee.*

No. 00-1514

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-99-2388-S)

Argued: November 2, 2000

Decided: February 5, 2001

Before WILLIAMS and MICHAEL, Circuit Judges, and
Joseph F. ANDERSON, Jr., Chief United States District Judge
for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Paul D. Raschke, BOULAND, GISRIEL & BRUSH,
L.L.C., Baltimore, Maryland, for Appellant. Susan Elizabeth Bel-
mont, New York, New York, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

This case arises on appeal by plaintiff, Kendra Dwyer (Dwyer), who seeks to recover long term disability benefits under a policy administered by defendant, Metropolitan Life Insurance Company (MetLife). Dwyer began working for Science Applications International Corporation (SAIC) in November 1995 as a project analyst, and was enrolled in SAIC's Long Term Disability Policy (the SAIC Plan) that is funded, in part, by MetLife.

Dwyer suffers from congenital spinal stenosis,[1] has had two back surgeries, and was also involved in a car accident in 1996 that exacerbated her back problems. Dwyer returned to work seven months after her last surgery in February 1997, but her condition continued to deteriorate and it became increasingly difficult for her to work a full eight-hour day. She left work on July 31, 1998, and received short term disability payments. On November 12, 1998, she applied for long term disability benefits. MetLife denied her application for long term disability benefits on March 5, 1999, asserting that the submitted information did not objectively document the inability to perform all material job duties.

Dwyer filed a complaint against MetLife in the district court for (I) wrongful denial of benefits in violation of the Employee Retirement Income Security Act (ERISA) 29 U.S.C. § 1001, *et seq.*, (II) breach of fiduciary duty, and (III) a declaratory judgment for unconstitutional delegation of a public function. The parties then filed cross motions for summary judgment. The district court granted MetLife's motion

---

[1]Spinal stenosis is defined as the narrowing of the vertebral canal, nerve root canals, or intervertebral opening of the lumbar spine caused by encroachment of bone upon the space. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1576 (28th ed. 1994) [hereinafter DORLAND'S].

as to Counts I and II on the grounds that "an objective decision-maker, free of any conflict of interest, could reasonably have concluded that plaintiff was not disabled, as defined in the plan," and that the plaintiff did not have a statutory right to a private cause of action under Section 502(a)(3) of ERISA.[2] Dwyer then filed this appeal. For the reasons stated below, we affirm the district court's judgment.

I.

*STATEMENT OF FACTS*

SAIC employed Dwyer as a project analyst from November 1995 through July 1998. According to a job description completed by Dwyer's supervisor, Dwyer's job responsibilities included preparing and editing reports, copying and distributing reports, and telephone duties. In a normal work day Dwyer's job required that she sit for eight hours, stand for fifteen minutes, walk for fifteen minutes, and occasionally lift or carry up to ten pounds. As an SAIC employee, Dwyer was enrolled in the SAIC Plan, which MetLife partially funded and administered.

The SAIC Plan provides that disability benefits will be paid upon "proof" of disability that is "satisfactory" to MetLife. The SAIC Plan defines disability as follows:

> Disability or disabled means that, due to an injury or sickness, you require the regular care and attendance of a Doctor and:
>
> (1) you are unable to perform each of the material duties of your regular job; and
>
> (2) after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or

---

[2]The third cause of action was dismissed by the plaintiff by Notice of Voluntary Dismissal.

(3) you, while unable to perform all of the material duties of your regular job on a full-time basis, are:

(a) performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and

(b) earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same injury or sickness.

Dwyer underwent back surgery on February 18, 1997, at Johns Hopkins Hospital. At that time she had a post lumbar osteotomy and removal of a previously installed Harrington rod,[3] and posterior lumbosacral fusion as well as anterior lumbar fusion. It was not possible to remove all of the hardware associated with the installation of the Harrington rod. Dwyer was examined by Dr. John Kostuik and Dr. Sanjog Mathur on April 24, 1997, approximately nine weeks following surgery. She stated that the pain in her lower back was almost completely gone.

Dwyer was next reviewed by Dr. Kostuik on August 6, 1997, complaining of discomfort in her lower back. Dr. Kostuik opined that the discomfort was "probably related to the instrumentation" still remaining in her back. She also complained of heaviness in her leg, which the physician reported was "probably related to her very significant spinal stenosis." Her activities were unrestricted, her x-rays were "most excellent," her neurological examination was unremarkable, and her long term outlook was described as "quite good."

Dwyer was next seen by Dr. John Carbone at Johns Hopkins on October 21, 1997, two months earlier than her regularly scheduled appointment, because she was experiencing persistent pain in her right leg. Dr. Carbone's notes state that Dwyer had "predictive pain" with no complaints of overall pain control, for which she occasionally took Darvocet that she had gotten from her mother. Dwyer reported that she had returned to full-time work but that while sitting at her

---

[3]A Harrington rod is a type of surgically inserted instrumentation for treatment of scoliosis. DORLAND's, *supra* note 1, at 846.

desk for two hours or longer she began to feel worsening leg pain. Dr. Carbone emphasized that sedentary, as opposed to ambulatory, activity was more of a problem for Dwyer as shown by her ability to walk more than one mile. The examination revealed that she was "quite tender to palpation over her inferior instrumentation although she is moderately tender up the entire midline where her Harrington rod used to be." The physical examination revealed that Dwyer could walk on her toes and heels without complaint and walk with a normal gait. Dwyer's x-rays demonstrated that her hardware alignment had not changed at all and the fusion was excellent. Finally, Dr. Carbone's assessment states that Dwyer was improving and that he provided her with Motrin for slight bursitis.

Thereafter, Dwyer returned to Johns Hopkins on December 10, 1997, complaining of persistent pain. Dr. Carbone noted significant worsening of the dysesthesias[4] in the L5-S1 distribution of her left foot. Dwyer described this as the most "significant issue" for her at that time. Dwyer reported that she had returned to work full-time for eight hours per day but that she had difficulty sitting in a chair for one or two hours at a time. She also reported sensitivity at the sites of the superior and inferior ends of her hardware while sitting in hard-back chairs. Her doctor ordered a CT scan and myelogram to explore the cause of her radicular symptoms.

Dwyer returned to Johns Hopkins for an examination on March 11, 1998, and was seen by Dr. Kostuik. She and her doctor discussed her continuing radicular pain. Apparently referring to the CT scan and myelogram, Dr. Kostuik stated that "we have recently obtained some further studies on her which confirm a continuing radiculopathy." He stated that this pain was probably "related to her chronic preexistent problems . . . and probably some irreversible changes in her nerves. It is something she will have to cope with." He also remarked that she was able to obtain about 75 percent relief using the drug Elavil.[5]

---

[4]Dysesthesias is distortion of any sense, especially of that of touch; an unpleasant abnormal sensation produced by normal stimuli. DORLAND'S, *supra* note 1, at 515.

[5]Elavil is a trademark for amitriptyline hydrochloride, a tricyclic antidepressant sometimes used for the treatment of chronic pain. DORLAND'S, *supra* note 1, at 534, 59.

Dwyer returned for a follow-up examination at Johns Hopkins on September 9, 1998, approximately one and one-half years after surgery. At this point she had been on short term disability for about one month. Dr. Kostuik noted that although the surgery had produced a "good solid fusion," Dwyer continued to report a "good deal of discomfort in her lower back." He expressed difficulty assessing the exact cause of the pain in her lower back because the x-rays did not suggest a problem with the sacroiliac joint and the "instrumentation [was] not particularly prominent." He reported that there was about a ten to fifteen percent chance that the instrumentation caused her lower back pain. Dr. Kostuik also noted the conflict that Dwyer was experiencing with her supervisor at SAIC because of her medical condition. He recommended that Dwyer "carry on as she has for the present time" until her next six-month review.

On or about November 12, 1998, Dwyer submitted a claim to MetLife for long term disability benefits under the SAIC Plan, based on a last day worked of July 31, 1998, and a disability date of August 3, 1998. After submission of Dwyer's application for long term benefits, MetLife began its claim review. On November 23, 1998, Dwyer's file was reviewed by MetLife's in-house Nurse Coordinator, Maria Cefaratti, R.N. On November 24, 1998, Nurse Cefaratti contacted the office of Dr. Kostuik, Dwyer's treating physician. She left a message with Dr. Kostuik's office explaining who she was and asking whether Dr. Kostuik had advised Dwyer to cease working and if so, on what date and based upon what diagnosis.

On December 2, 1998, MetLife's case management specialist sent a letter to Dwyer requesting that she have her physician complete and forward to MetLife an Attending Physician Statement (APS) on her behalf so that her claim could be evaluated. On that same date, December 2, 1998, one year and ten months after her surgery for scoliosis and kyphosis, Dwyer had an x-ray taken at Johns Hopkins and was examined by Dr. Kostuik and Dr. Karl Fournier. Dwyer informed them that she was still suffering from chronic pain. The physical examination revealed that she suffered from "pain close to the S1 area on both sides very close to the midline and also pain radiating down her left thigh." The report also noted that she was still on Darvocet and amitriptyline. Dr. Fournier noted that Dwyer's strength was normal in her lower extremities, her gait was normal, she did not have

any pain to the Patrick test,[6] and she did not have any contracture[7] around the fusion site. Dwyer's x-rays appeared to show that both fusions were good. Dwyer was given an injection of lidocaine and told to call back in 48 hours. The doctor suggested that if, after that time, the pain was removed, she might benefit from instrumentation removal. If not, she was told to do more exercise such as walking on a treadmill or bicycling so that "she would be more tolerant to the pain."

MetLife received a Physical Capacity Evaluation (PCE) from Dr. Kostuik on December 16, 1998, and an APS from Dr. Kostuik on December 18, 1998. The APS stated that the primary diagnosis of Dwyer was "kyphoscoliosis"[8] and that she had subjective symptoms of pain and spinal stenosis. In response to the question on the APS, "[d]id you advise the patient to cease the above noted occupation," Dr. Kostuik did not check either box indicating "yes" or "no," but simply noted "can't do job."

On December 31, 1998, Dwyer's claim file, including the PCE and APS from Dr. Kostuik, was once again reviewed by Nurse Cefaratti. At that time, Nurse Cefaratti noted that "information provided by Dr. Kostuik is not sufficient to determine if severity of condition is consistent with [restrictions and limitations]. Will discuss this with [the case management specialist] and together decide next plan of action."

Because MetLife still had not received Dr. Kostuik's office notes on Dwyer as of January 13, 1999, the case management specialist sent a letter to Dwyer requesting Dr. Kostuik's office notes from July 1998 to present. On January 14, 1999, Dr. Kostuik submitted a letter in which he summarized Dwyer's condition as totally disabling. MetLife subsequently received copies of Dr. Kostuik's medical records for

---

[6]The Patrick test is a flexibility test administered with the patient supine; the thigh and knee are flexed and the ankle is raised to the knee of the opposite leg. DORLAND'S, *supra* note 1, at 1681.

[7]Contracture is defined as a condition of fixed high resistance to passive stretch of a muscle. DORLAND'S, *supra* note 1, at 373.

[8]Kyphoscoliosis is the backward and lateral curvature of the spinal column. DORLAND'S, *supra* note 1, at 890.

Dwyer on February 4, 1999. On February 5, 1999, Nurse Cefaratti again reviewed Dwyer's file and noted the following:

> Information provided by Dr. Kostuik does not seem consistent with the information present in the Johns Hopkins records, and also depicts the possibility of pyschosocial factors affecting this claim. It is significant that testing performed in the Hopkins records did not elicit abnormal responses. Pain was elicited by applying pressure over the SI area. There are contractures around the fusion site. Assessment: We could benefit from discussing this particular case with our in-house physician for his opinion on retained level of function at this point.

On February 10, 1999, Dwyer's file, including all records and available documents, was reviewed by independent physician consultant, Kevin Smith, D.O.[9] Dr. Smith's report indicated:

> [Dwyer] has kyphoscoliosis s/p fusion [and] instrumentalities [about] 1 years ago. Records show solid fusion [and] tenderness. No other abnormalities documented. She has pain primarily [and] also conflicts with her supervisor. She has been out of work since 7/31/98. Attending physicians' PCE is consistent with light work up to 4 hrs/day. Her job is sedentary.
>
> Medical records do not support inability to work in this case. I do not find medical evidence which would necessitate restriction of a 4 hr work day. She should be able to work at her regular job as long as frequent breaks with stretching and change of positions are allowed.

On or about February 19, 1999, MetLife received additional medical records on Dwyer. Dwyer's file was once again reviewed by Nurse Cefaratti. On February 24, 1999, Dr. Smith reviewed the additional medical records for Dwyer, including records from February

---

[9]Although Dr. Smith makes on-site visits to MetLife to review claims and is occasionally referred to as an "in-house" consultant/physician, he is actually an employee of Network Medical Review.

18, 1997, March 11, 1998, and September 9, 1998. He concluded that there was "no new information or objective findings noted in these records that would preclude her from her regular work as long as frequent breaks are allowed as noted above."

After reviewing the entire administrative record available to MetLife at that time, MetLife determined that Dwyer failed to meet the eligibility requirements for long term disability benefits, and denied her claim by letter dated March 5, 1999.

On March 23, 1999, Dwyer formally requested review of the denial decision. Dwyer stated that she was under the regular care of Dr. Kostuik and that her next appointment was scheduled for June 9, 1999. She included a copy of the previously submitted January 14, 1999, letter in which Dr. Kostuik opined that Dwyer was totally disabled.

On June 10, 1999, MetLife wrote Dwyer informing her that after further review of her file, it had concluded that its initial determination to deny her claim for benefits was correct. Specifically, MetLife explained that the medical information in Dwyer's file failed to support an inability to perform the material duties of her own occupation as a project analyst from the time of her last day worked, throughout the elimination period and beyond.

## II.

### *DISCUSSION*

#### A.    *Standard of Review for Benefits Denial Decisions*

This court has developed a well-settled framework for reviewing the denial of benefits under ERISA plans. *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000); *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). When a plaintiff appeals the grant of summary judgment, the court engages in *de novo* review. *Ellis*, 126 F.3d at 232 (citing *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)). If the benefit plan grants the administrator discretion to determine eligibility or to construe the terms of the plan, the court then reviews the decision to deny benefits for abuse of discretion. *See*

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115 (1989); *Feder*, 228 F.3d at 522; *Ellis*, 126 F.3d at 232. Under this deferential standard of review, the reviewing court will not disturb the administrator's decision if it is reasonable, even if the court would have independently come to a different conclusion. *Feder*, 228 F.3d at 522; *Ellis*, 126 F.3d at 232. Numerous factors are relevant in determining the reasonableness of a fiduciary's exercise of discretion. *See Firestone*, 489 U.S. at 115; *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989). A decision denying disability benefits is reasonable if it is the result of a deliberate, principled reasoning process, supported by substantial evidence in the claim record. *Ellis*, 126 F.3d at 232.

## B.  *MetLife's Denial of Dwyer's Claim*

The SAIC Plan unambiguously grants MetLife discretionary authority to determine eligibility for benefits and to interpret the Plan terms thus triggering an abuse of discretion standard. The SAIC Plan contains the following delegation of discretionary authority:

> In carrying out their respective responsibilities under the plan, the plan administrator and other plan fiduciaries shall have discretionary authority to interpret the terms of the plan and to determine eligibility for and entitlement to plan benefits in accordance with the terms of the plan. Any interpretation of determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed in determining whether there is an abuse of discretion. *Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000) (citing *Firestone*, 489 U.S. at 115); *Ellis*, 126 F.3d at 233. To counteract the effect of such a conflict, the court may reduce the amount of deference extended to the fiduciary to a modified abuse of discretion standard. *See Ellis*, 126 F.3d at 233. The court must determine, based on review of the record before the fiduciary at the time of decision-making, whether the administrator's

decision is consistent with a decision that might have been made by a fiduciary acting free of the interests which conflict with those of the beneficiaries. *See Ellis*, 126 F.3d at 233 (quoting *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996)).

In this case, the question is whether MetLife abused its discretion by improperly denying Dwyer long term disability benefits. Dwyer argues that MetLife abused its discretion in denying her claim based on the "asserted lack of objective medical evidence" and by giving weight to the "unsubstantiated, conclusory medical opinion of its in-house consultant."

Dwyer relies on two federal circuit court opinions to support a rejection of the objective evidence standard. However, both cases are distinguishable from the facts in the present case. Both of the cited cases deal with lack of an identifiable etiology for determining whether the claimant was indeed disabled. In *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460 (10th Cir. 1997), Hancock denied Gaylor's claim because her physical condition could not be "verified by the use of clinical and laboratory diagnostic techniques." The court held that Gaylor's physicians had provided ample evidence of a debilitating condition even though no particular etiology was identified. Similarly, in *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3rd Cir. 1997), the court held that the administrator erred in requiring that the claimant submit "objective medical evidence" establishing the etiology of chronic fatigue syndrome.

In Dwyer's case, there is no question as to the etiology of her condition — she was diagnosed with kyphoscoliosis. MetLife's initial denial letter does not require that Dwyer prove her claim by objective medical evidence, it merely notes that "the information submitted does not objectively document the inability to perform all of the material duties of your job on a full time basis." Under the SAIC Plan, Dwyer was obligated to provide proof of her disability. Unfortunately, she failed to establish evidence of disability to the satisfaction of MetLife.

Dwyer was invited to submit additional medical or vocational information and any facts, data, questions or comments that she felt appropriate to help in evaluating her appeal. The only additional

information Dwyer submitted was a letter asking that her claim be reevaluated and a copy of the previously submitted January 14, 1999 letter of Dr. Kostuik. Although Dr. Kostuik's letter offers the conclusory opinion that Dwyer is totally disabled, none of her medical records suggest to this court a finding of total disability. MetLife's denial of Dwyer's claim for long term disability benefits was not based on an improper demand for objective medical evidence, but was a reasonable exercise of its discretion under the terms of the SAIC Plan.

Dwyer argues that MetLife gave too much weight to the "biased" opinion of Dr. Kevin Smith, and too little weight to her doctors' opinions, especially those of Dr. Kostuik. She argues that "Dr. Smith's perfunctory armchair summary discounts [her] significant pathological history and symptoms, and affords this Court no indication that his judgment is animated by anything more than institutional bias." Dwyer's apparent reason for stating that Dr. Smith was biased is because he was referred to as an in-house consultant. However, as stated earlier, Dr. Smith is not a MetLife employee, but is an independent medical reviewer. Dr. Smith based his report on Dwyer's submitted medical reports that included the subjective impressions of her treating physicians. Dwyer argues that Dr. Smith "summarily rejected all of the objective and subjective evidence" supporting her claim, suggesting that a diagnosis of scoliosis is sufficient evidence of disability under the SAIC Plan.

There is no indication that Dr. Smith disregarded Dwyer's diagnosis, in fact, the first line of his report confirms that she "has kyphoscoliosis." Nor does Dr. Smith suggest, as Dwyer argues, that she has been cured by surgery, only that "no further surgery has been recommended." That MetLife accepted the opinion of Dr. Smith rather than those of Dwyer's treating physicians is not in itself an abuse of discretion. *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 602 (5th Cir. 1994) (upholding a benefits denial decision based on the medical consultants' opinions that were contrary to those of plaintiff's treating physicians); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994) (decision to deny benefits was not unreasonable where it "simply came down to a permissible choice between the position of . . . MetLife's independent medical consultant, and the position of [the claimant's physicians]").

In the months following Dwyer's surgery, although various physicians noted her complaints of pain or discomfort, none of the physicians indicated that she was unable to work or should be placed on long term disability. On one occasion Dr. Kostuik opined that her pain was something she would have to "learn to cope with" and on another occasion Dr. Fournier stated that she should exercise more so that she "would be more tolerant to the pain." A few weeks after this second pronouncement, Dr. Kostuik submitted a letter stating Dwyer was totally disabled. This court has held that it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir. 1999). Therefore, MetLife was within its discretion to rely on the subsequent review of the record by Dr. Smith in determining whether Dwyer was disabled.

After careful analysis of the administrative record, this court concludes that there is ample evidence in the record to support a denial of long term disability benefits. Dr. Smith's report stated that no "new information or objective findings noted in these [newly submitted] records" precluded Dwyer from her regular work as a project analyst. Although Dr. Smith's use of the term "objective" may have been an unfortunate choice of words, MetLife's decision to deny Dwyer's claim was a reasonable result of its claims review process (including four file reviews by a Nurse Coordinator and two file reviews by an independent medical consultant), and was supported by substantial evidence. Reasonable minds may disagree, but MetLife's decision is not so clearly erroneous as to constitute an abuse of discretion.

## C.  *Breach of Fiduciary Duty Claim*

Dwyer argues that the district court erred in granting summary judgment on Count II because the parties had agreed to postpone discovery pending the outcome of the cross motions. The issue in Count II was whether MetLife breached its fiduciary duty to the plaintiff by adopting unfair claims practices. Under Section 502(a)[10] of ERISA, a

---

[10]Section 502(a) of ERISA provides:

  A civil action may be brought—

plan participant or beneficiary may bring suit against a fiduciary for appropriate relief. However, the recovery goes to the benefit of the plan as a whole, rather than to the individual beneficiary. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140-142 (1985).

Dwyer's complaint, filed August 6, 1999, did not seek damages for the Plan — she specifically stated that MetLife breached its fiduciary to her. On March 16, 2000, Dwyer submitted a Rule 56(f) affidavit asking the district court to postpone discovery. *See* FED. R. CIV. P. 56(f). It was in this affidavit that Dwyer stated that she planned to prove that MetLife was breaching its fiduciary duties to SAIC beneficiaries.

The Supreme Court has recognized that in certain circumstances a beneficiary may sue for breach of fiduciary duty, but the remedy is limited to "appropriate relief." "[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996). Congress has provided Dwyer a right to seek benefits under ERISA § 502(a)(1)(B). The district court held that the availability of another avenue of relief foreclosed Dwyer's civil action as an individ-

---

(1) by a participant or beneficiary—

\*\*\*\*

    (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan . . . . Employee Retirement Income Security Act of 1974, § 502(a), 29 U.S.C. § 1132(a).

ual plan employee. Because Dwyer does not identify any defect in this relief that would make removal of MetLife as the SAIC plan fiduciary an appropriate equitable relief, her claim must fail, and further discovery would not be necessary.

## III.

### *CONCLUSION*

Based on the foregoing analysis, the district court's order granting summary judgment in favor of MetLife is

*AFFIRMED.*