Christopher T. STARNES, Plaintiff,

v.

GENERAL ELECTRIC COMPANY, Defendant.

No. 1:00CV1259.

United States District Court, M.D. North Carolina.

March 25, 2002.

Nancy Pulliam Quinn, The Quinn Law Firm, Greensboro, NC, for Plaintiff.

Charles Matthew Keen, Sheri L. Roberson, Ogletree Deakins Nash Smoak & Stewart, P.C., Raleigh, NC, for Defendant.

*MEMORANDUM OPINION*

BEATY, District Judge.

## I. INTRODUCTION

This matter is currently before the Court on Defendant General Electric Company's ("Defendant" or "GE") Motion for Summary Judgment [Document # 19] as to Plaintiff Christopher T. Starnes' ("Plaintiff") claims under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") and the Americans with Disabilities Act, 42 U.S.C.

§ 12101, *et seq.* (the "ADA"), ·as well as Plaintiff's state law claims for intentional and negligent infliction of emotional distress, bad faith, and punitive damages. For the reasons explained below, Defendant's Motion for Summary Judgment is GRANTED as to each of Plaintiff's claims and all claims against Defendant are hereby DISMISSED.

## II. FACTUAL AND PROCEDURAL BACKGROUND·

The documents available to the Court indicate that Plaintiff began working for General Electric Industrial Systems, a division of GE, in March, 1989. Plaintiff worked as an assembler at a manufacturing facility in Mcbane, North Carolina. According to Plaintiff, he began suffering from severe emotional problems during the spring of 1999; Plaintiff's problems apparently stemmed from the death of two close personal acquaintances. Because of his emotional problems, Plaintiff saw Dr. Larry Norton, a physician at the Kernodle Clinic, on April 27, 1999. After evaluating Plaintiff, Dr. Norton noted that Plaintiff appeared to be in some emotional distress. Dr. Norton further noted that Plaintiff spoke candidly about his desire to receive disability benefits for time off work. Dr. Norton prescribed medication for Plaintiff and excused him from work for one week, through May 4, 1999.

On that same day, April 27, 1999, Plaintiff applied for short-term disability benefits with the General Electric Disability Center (the "Disability Center").[1] The Disability Center requested information from Dr. Norton from which to make its determination regarding Plaintiff's alleged disability. Initially, the Disability Center

got no response from Dr. Norton's office. Having received no confirmation of Plaintiff's alleged condition, the Disability Center denied Plaintiff's application for short-term disability benefits. The reason cited by the Disability Center was that it was unable to confirm Plaintiff's disability because Dr. Norton had not provided the requisite documentation.

On May 5, 1999, Plaintiff again saw Dr. Norton. In his evaluation, Dr. Norton noted that Plaintiff was clearly focused on the need to remain out of work for an extended amount of time and receive disability benefits. Dr. Norton further noted that Plaintiff's determination to stay out of work appeared to be the result of personal choice rather than medical necessity. For that reason, Dr. Norton stated that Plaintiff would need to consult a psychiatrist if he was intent on remaining out of work for a prolonged period of time. Pending a psychological evaluation, Dr. Norton excused Plaintiff from work for an additional two weeks, that is, through ·May 19, 1999.[2] According to Defendant, however, Plaintiff never saw the specialist to whom he was referred because of the cost of his co-pay. Instead, Plaintiff visited the County Mental Health Department. Plaintiff's visit was not fruitful, though, for the County Mental Health Department declined to become involved with Plaintiff's desire to secure disability benefits.

On the afternoon of June 1, 1999, Plaintiff met with Ms. Sandy Jones, a nurse at the Mebane ·facility where Plaintiff was employed. He provided her with the two medical excuse notes from Dr. Norton, covering Plaintiff's absences from work during the period from April 27, 1999 to

---

**1.** The Disability Center is the division of GE that manages and administers disability benefits through a contract ·service provider, Sedgewick Claims Management Services.

**2.** After May 19, 1999 passed, Plaintiff did not report to work despite the fact that he no longer had a medical excuse note from a physician.

May 19, 1999. According to Defendant, Ms. Jones informed Plaintiff that he needed to see a psychiatrist as soon as possible because GE did not have enough information to justify granting his request for disability benefits. Defendant also claims that Ms. Jones informed Plaintiff that further extensive absences from work must be excused by a medical professional or they would be considered job abandonment and could lead to his termination. Nevertheless, Plaintiff's absences continued because he was allegedly unable to work and could not, apparently due to scheduling difficulties, secure an appointment with a psychiatrist.

Plaintiff formally appealed the denial of his claim for disability benefits on June 11, 1999. Several days thereafter, while Plaintiff's appeal was pending, Ms. Jones sent Plaintiff a letter requesting that he contact her regarding his repeated absences from work. According to Defendant, Plaintiff never responded to this letter. Plaintiff did, however, visit Dr. Norton again on June 17, 1999. After this evaluation, Dr. Norton noted that Plaintiff was again focused on obtaining disability benefits so that he could miss work for an extended period of time. Plaintiff, of course, claims that he was concerned about his eligibility for disability benefits simply because he wanted to protect his job while he was recovering from his alleged disability. Dr. Norton, nevertheless, released plaintiff from his care after Plaintiff notified him that Plaintiff was going to see a psychiatrist, Dr. Yvonne Monroe, in Chapel Hill, North Carolina. Plaintiff's first visit with Dr. Monroe was on July 23, 1999. After that visit, Dr. Monroe apparently diagnosed Plaintiff with bipolar disorder.[3]

That same day, July 23, 1999, Defendant sent Plaintiff another letter, requesting that Plaintiff either show up for work, or contact Defendant to explain his absences. Again, according to Defendant, Plaintiff did not respond to this letter. Not long thereafter, on August 16, 1999, Plaintiff's formal appeal of the denial of his disability benefits was denied. The next day, on August 17, 1999, Defendant claims that it sent Plaintiff another letter, again requesting that Plaintiff either come to work or contact GE regarding his absences. Once more, according to Defendant, Plaintiff did not respond to this letter.

In a final attempt to have Plaintiff's request for disability benefits granted, Robert S. Hodgman, Plaintiff's attorney at the time, contacted the Disability Center. Mr. Hodgman urged the Disability Center Appeals Board to revisit Plaintiff's request for short-term disability benefits while considering Dr. Monroe's July 23, 1999 evaluation of Plaintiff. Per Mr. Hodgman's request, the Appeals Board did reconsider Plaintiff's file. The Appeals Board determined, however, that because Dr. Monroe did not begin treating Plaintiff until July 23, 1999, she was not in the position to assess Plaintiff's condition prior to that date. Therefore, even though Dr. Monroe diagnosed Plaintiff with a disabling condition, that is, bipolar disorder, as of July 23, 1999, there was no information in Plaintiff's file regarding a disability prior to that date. The only information relating to Plaintiff's condition prior to July 23, 1999 came from Dr. Norton, who, as stated, did not diagnose Plaintiff with a disabling condition. Plaintiff, therefore, could not support his absences from work during the months of April, May, and June, 1999 with a claim of disability.

---

**3.** Bipolar disorder is defined as a psychological condition, or mood disorder, in which both manic and depressive episodes occur with varying frequency. *See* Dorland's Illustrated Medical Dictionary 201 (28th ed. 1994).

Based on Dr. Norton's assessment, and the fact that Plaintiff was not diagnosed as disabled by Dr. Monroe until July 23, 1999, the Appeals Board again denied Plaintiff's claim for disability benefits on November 12, 1999.

Despite the letters sent by GE, and despite the fact that his final appeal was denied by the Disability Center Appeals Board, Plaintiff did not return to work. As a result, Defendant terminated Plaintiff's employment on November 26, 1999. The reason cited by Defendant was job abandonment based on Plaintiff's prolonged absence from work without a sufficient medical excuse. After his termination, Plaintiff began to seek relief for what he perceived as an improper employment action.

On May 8, 2000, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") alleging that he was terminated from his employment in violation of the ADA. The EEOC issued a right to sue letter to Plaintiff on September 28, 2000. Soon thereafter, on December 22, 2000, Plaintiff filed suit against GE and Central States Health & Life Company of Omaha seeking relief under ERISA, the ADA, and North Carolina state law. Plaintiff also seeks to recover punitive damages as well as damages for Defendant's alleged bad faith. Particularly, Plaintiff's ERISA claim alleges that he was improperly denied benefits to which he was allegedly entitled. His ADA claim alleges that he was terminated because of his alleged disability. Finally, Plaintiff's claims based on North Carolina State law are for intentional and negligent infliction of emotional distress, bad faith, and punitive damages. On January 16, 2001, Plaintiff dismissed Central States Health & Life Company of Omaha from this action, leaving GE as the sole defendant in this case. After complet-

ing discovery, on December 17, 2001, GE filed its Motion for Summary Judgment [Document # 19] seeking dismissal of the case in its entirety. The Court will now consider the merits of Defendant's Motion for Summary Judgment.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary Judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court is not "'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting *Schuylkill & Dauphin Imp Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)). In considering a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party, in this case, Plaintiff, and accord that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Moreover, the Court should not grant a motion for summary judgment "'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Nevertheless, a mere scintilla of evidence is insufficient to withstand a mo-

tion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202. There must be evidence "on which the jury could reasonably find for the plaintiff." *Id.* With this standard in mind, the Court must evaluate the merits of Plaintiff's claims to determine whether summary judgment in favor of Defendant is proper.

### B. Plaintiff's ERISA Claim

Pursuant to his claim under ERISA, Plaintiff seeks to recover benefits that he claims he should have received due to his alleged disability. Plaintiff's ERISA claim, therefore, apparently relies upon 29 U.S.C. § 1132(a)(1)(B), which authorizes a civil suit by a plan participant or beneficiary to "recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Relying on that provision of ERISA, Plaintiff argues that he should recover, under the instant lawsuit, benefits in excess of $10,000.00. As stated, however, prior to filing suit Plaintiff pursued his administrative remedies, seeking relief from the Disability Center, where his claim for disability benefits as well as both of his appeals were denied. Plaintiff's ERISA claim is therefore before this Court for administrative review of the Disability Center's decision to deny Plaintiff's claim for disability benefits.

When reviewing an administrator's decision, the standard to be applied by the Court depends upon whether or not the administrator is vested with discretion to make determinations under the plan. If the administrator does not have discretion, then the Court must review the decision *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) (holding that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"). If, however, the administrator is vested with discretion, the decision is simply reviewed for abuse of that discretion. *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir.2000) ("If the reviewing Court determines that the language of the plan confers discretion on the administrator to determine eligibility or to construe terms of the plan, then a court reviews the decision to deny benefits for abuse of discretion."). In reviewing the administrator's decision, the Court must apply a three step inquiry. First, the Court is to determine, *de novo*, whether the GE Life, Disability and Medical Plan (the "Disability Plan") administrator, in this case, the Disability Center, is vested with the aforementioned discretion. Second, the Court must consider whether the administrator acted within the scope of its discretion. Finally, if the previous two questions are answered affirmatively, the Court must consider whether the administrator abused its discretion. *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir.1996) (outlining the three step process for reviewing an administrative decision under ERISA). Otherwise, a *de novo* standard of review is proper. *Barron v. Unum Life Ins. Co. of Am.*, 260 F.3d 310, 315 (4th Cir.2001). The Court will now address each of the three elements in turn.

#### a. Whether the Disability Plan Confers Discretion

■ With respect to whether the Disability Plan confers discretion, the Court notes that the parties do not dispute the issue, as both Plaintiff and Defendant maintain that the plan does indeed confer discretion upon the Disability Center. After reviewing the language of the Disabili-

ty Plan, this Court agrees. The pertinent section of the Disability Plan reads:

> Determinations of all benefit payments under the [Disability] Plan will be made by the carrier.[4] Accordingly, the management and control of the operation and administration of claim procedures under the [Disability] Plan, including the review and payment or denial of claims and the provisions of full and fair review of claim denial ... shall be vested in the carrier.

(App. to Def.'s Mem. Supp. Mot. Summ. J., Plan Document, at 143.) No specific language is required to trigger the abuse of discretion standard of review. *Feder,* 228 F.3d at 522. In fact, an explicit grant of discretionary authority is not required, as the Fourth Circuit has recognized, in certain cases, discretion by implication. *Id.* at 523; *see, e.g., Boyd v. Trustees of the United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir. 1989); *United McGill Corp. v. Stinnett,* 154 F.3d 168, 171 (4th Cir.1998). The language of the Disability Plan in this case demonstrates that the Disability Center is charged with the authority to determine the eligibility of claimants seeking disability benefits. In addition, the fact that the Disability Center is responsible for controlling the appeal of denied claims indicates that it is the ultimate decisionmaker with respect to benefits under the Disability Plan. The Court therefore finds that the Disability Plan confers sufficient discretion upon the Disability Center so as to support the use of the abuse of discretion standard in reviewing this matter.

### b. Whether the Disability Center Acted Within the Scope of its Discretion

Prior to applying the abuse of discretion standard, the Court must ensure that the Disability Center was acting within the scope of the discretion granted under the Disability Plan. *Haley,* 77 F.3d at 89. The terms of the Disability Plan quoted above grant the Disability Center the authority to make all benefits determinations under the Disability Plan. Moreover, the Disability Plan grants the Disability Center the power to control the denial of claims as well as the appeals process for all denied disability claims. The Disability Center was simply carrying out these functions when it denied Plaintiff's claim for short-term disability benefits. Therefore, this Court finds that in denying Plaintiff's claim for disability benefits, the Disability Center was acting within the scope of the discretion granted under the Disability Plan.

### c. Application of the Abuse of Discretion Standard

■ To the extent that the Disability Center is vested with discretion under the terms of the Disability Plan and acted within the scope of that discretion, the abuse of discretion standard requires that the Disability Center's decision with respect to Plaintiff's claim for short term disability benefits be upheld as long as it was reasonable. *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir.1995). A decision is considered reasonable if it results from deliberate principled reasoning and is supported by substantial evidence. *Id.*

In support of its decision to deny Plaintiff's disability claim, Defendant notes that Dr. Norton's evaluation revealed no basis upon which to find Plaintiff disabled during the months of April, May, and June, 1999. In fact, Dr. Norton's notes indicate that Plaintiff was open about his desire to

---

4. The "carrier" is defined within the Disability Plan as the General Electric Corporation, or GE. As stated previously, the Disability Center is the division of GE, managed by Sedgewick Claims Management Services, that handles disability claims.

obtain disability coverage, even though Dr. Norton never diagnosed Plaintiff with a disabling condition. (*See, e.g.,* App. to Def.'s Mem. Supp. Mot. Summ. J., at R–55, R–210.) Because Plaintiff could produce no evidence to substantiate his claim for disability benefits, the Disability Center denied his claim and his first appeal. Similarly, because Plaintiff could not demonstrate that he was disabled prior to Dr. Monroe's July 23, 1999 evaluation, the Disability Center determined that Dr. Monroe's evaluation was not relevant to the question of whether Plaintiff was disabled from April, 1999 through June, 1999, and therefore denied Plaintiff's final appeal. Plaintiff's chief response to Defendant's position is that Dr. Norton misdiagnosed him, as allegedly evidenced by Dr. Monroe's later evaluation and diagnosis.

It appears to this Court, then, that the Disability Center considered the basis for Plaintiff's request for disability benefits and addressed it with sufficient reasoning. Not only did the Disability Center review the notes from Dr. Norton's evaluations, but it had an advisor physician, Dr. Tim Smith, review Plaintiff's file during the consideration of Plaintiff's first appeal. Moreover, the Disability Center's decision was supported by the evidentiary information provided to it. Dr. Norton's notes clearly indicate that he found no basis for Plaintiff's desire to obtain disability coverage, and noted that Plaintiff's request for such coverage was a function of personal choice and not medical necessity. (App. to Def.'s Mem. Supp. Mot. Summ. J., at R–55.) This Court therefore finds that it was reasonable for the Disability Center to rely on Dr. Norton's evaluation in making

its determination regarding Plaintiff's disability claim. Furthermore, it was likewise reasonable for the Disability Center to determine that Dr. Monroe's evaluation on July 23, 1999 did not support Plaintiff's claim that he became disabled in April, 1999, because without having evaluated Plaintiff in April, 1999, Dr. Monroe had no way to know what Plaintiff's condition might have been at that time. The Disability Center, therefore, did not abuse its discretion in denying Plaintiff's claim. Because the decision of the Disability Center was reasonable given the facts presented to it, and Defendant has satisfied the abuse of discretion standard, this Court finds that there is no genuine issue of material fact with respect to whether the Disability Center abused its discretion in denying Plaintiff's claim for short-term disability benefits. Defendant is therefore entitled to judgment as a matter of law. Consequently, Defendant's Motion for Summary Judgment with respect to Plaintiff's ERISA claim is GRANTED and Plaintiff's claim pursuant to ERISA is hereby DISMISSED.

## C. Plaintiff's ADA Claim

Pursuant to his claim under the ADA, Plaintiff seeks a declaratory judgment that Defendant violated the ADA in terminating his employment.[5] The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms conditions, and privileges of employment." 42 U.S.C. § 12112(a). The parties do not dispute

---

5. Originally, in addition to a declaratory judgment, Plaintiff sought equitable relief in the form of job reinstatement. Based on the Briefs submitted by the parties, however, it appears that Plaintiff has abandoned his demand for equitable relief in the form of job reinstatement, as he has yet to be released to work by his psychiatrist. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 7; Def.'s Mem. Supp. Mot. Summ. J., at 1.)

that Defendant is a "covered entity." [6]   In order to establish a prima facie case of disability discrimination under the ADA, then, according to the *McDonnell Douglas* proof scheme, Plaintiff must establish the following:

1) that he is within the ADA's protected class;

2) that he was discharged;

3) that at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and

4) that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 702 (4th Cir.2001); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once Plaintiff has established his prima facie case, a burden of production shifts to Defendant to articulate a legitimate non-discriminatory basis for terminating Plaintiff. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995). If Defendant meets this burden of production, the presumption created by the prima facie case vanishes, leaving Plaintiff with the ultimate burden of proving discrimination by showing that Defendant's proffered reason for his termination was a pretext for discrimination.[7]   *Id.*

With respect to Plaintiff's prima facie case, the Court notes that Plaintiff has only satisfied the second of the four elements, that is, that his employment was terminated.   Notably, the fact that Plaintiff's employment was terminated is the only one of the four elements that is not in dispute, as Defendant freely admits that it terminated Plaintiff on November 26, 1999. The Court, therefore, must only discuss the first, third, and fourth elements of Plaintiff's prima facie case.

■   As to the first element of Plaintiff's prima facie case, in order to be a member of the ADA's protected class, Plaintiff must establish that he is a qualified individual with a disability.   *Id.;* 42 U.S.C. § 12112.   The ADA defines "disability" as a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment.   *Haulbrook,* 252 F.3d at 702–03. Notably, Plaintiff was ultimately diagnosed with bipolar disorder by Dr. Monroe by the time his employment with GE was terminated.   The parties do not dispute that bipolar disorder is a recognized mental impairment.   Moreover, Dr. Monroe determined that Plaintiff's disability rendered him unable to return to work.   Given that there is no question that working is considered a major life activity, Plaintiff, then, was substantially limited in a major life activity based on Dr. Monroe's report. *Davis v. Univ. of N. Carolina,* 263 F.3d 95, 99 (4th Cir.2001) (noting that working is a major life activity under the ADA).   This

---

**6.** A "covered entity" is defined as an employer, which is further defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year ...." 42 U.S.C. § 12111(2) & (5)(A).

**7.** In *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, (4th Cir.1995), the Fourth Circuit held that in cases in which the employer claims that the plaintiff was termi-

nated for a nondiscriminatory basis, that is, a reason unrelated to the plaintiff's disability, the *McDonnell Douglas* proof scheme is appropriate for use under the ADA. *Id.* at 57–58. In the instant case, Defendant claims that Plaintiff was terminated not because of any condition related to his alleged disability, but rather, because of job abandonment.   The parties therefore properly invoke the *McDonnell Douglas* framework in seeking to defend their respective positions.

Court must find, therefore, that for the limited purpose of Plaintiff's prima facie case under the ADA, Plaintiff suffered from a disability as of July 23, 1999, which was prior to his termination.

■ The Court notes, though, that suffering from a disability is not, standing alone, sufficient to satisfy the first element of the *McDonnell Douglas* test. In order to fulfill the first element of his prima facie case, that is, to fall within the ADA's protected class, in addition to suffering from a disability Plaintiff must also be a "qualified individual." A "qualified individual" is a person with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position at issue. 42 U.S.C. § 12111(8). According to the Supreme Court, a "qualified individual" must be "able to meet all of a program's requirements in spite of his handicap." *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). Notably, Plaintiff bears the burden of demonstrating that he was capable of performing the essential functions of his job with the assistance of a reasonable accommodation. *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir.1994).

Plaintiff argues that he has met this burden because, according to Plaintiff, there is no evidence that he was not performing his duties at an acceptable level when he came to work. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 7.) Defendant, however, never claims that Plaintiff's performance was inadequate when he actually reported to work. The Court will therefore assume that Plaintiff was, indeed, performing effectively while at work. The fact that Plaintiff performed adequately when he came to work, however, is not the sole consideration. In addition to possessing the requisite skill for the job, Plaintiff

must also be "willing and able to demonstrate these skills by coming to work on a regular basis." *Tyndall*, 31 F.3d at 213. Only in the rare case where all of the functions of a job can be performed at home, can an employee who does not come to work claim that he can effectively perform his duties. *Id.* In other words, the average worker cannot perform his job, no matter how remarkable his skills, if he does not come to work. Plaintiff is no exception. As an assembler on a manufacturing line, Plaintiff cannot perform his duties without being present at the plant. This Court, therefore, must find that Plaintiff's extended absence from work rendered him unable to perform the essential functions of his job. *See id.*

■ Of course, Plaintiff argues that had he been allowed time off work as an accommodation, he would have been able to resume a more regular work schedule. Plaintiff, however, provided no time line under which his recovery and return to work could be anticipated. Because Defendant's attempts to get information from Plaintiff regarding his absence from work were unsuccessful, Defendant had no way to know how long it would take Plaintiff to recover and return to work. Defendant cannot be expected to wait an indefinite period of time for the accommodation to achieve its intended effect. *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir.1995). In fact, a reasonable accommodation is one that "presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Id.* Clearly, taking an unexplained and extended amount of time off work would not indicate that Plaintiff was presently able to perform his job functions.

The Court also notes that "[i]n mandating only those modifications that qualify as reasonable, Congress clearly meant to avoid placing employers in an untenable

business position." *Id.* Plaintiff's requested accommodation would certainly do just that. Defendant, in order to efficiently run its manufacturing facility, surely must keep its assembling positions staffed. Requiring Defendant "to stand by—or hire temporary help—while [Plaintiff] endeavors to improve his ... health would be a significant burden." *Id.* Therefore, this Court must find that to the extent that Plaintiff requests an accommodation of indefinite time off work, such would not be a reasonable accommodation.[8] As such, Plaintiff cannot perform the essential functions of his job, and is therefore not a qualified individual. Because this Court finds that Plaintiff is not a qualified individual, it must also find that Plaintiff is not within the ADA's protected class. Plaintiff has therefore failed to satisfy the first element of his prima facie case of disability discrimination.

▪ A consideration of the third element necessary for Plaintiff to establish a prima facie case would also require Plaintiff to demonstrate that he was meeting his employer's legitimate expectations at the time his employment was terminated. With respect to this element, Plaintiff simply claims that there is no evidence that he was performing poorly when he was at work. The Court notes, however, that by the time Plaintiff was terminated on November 26, 1999, he had not reported to work since April, 1999. Obviously, an ele-

ment of the employer's legitimate expectations is that the employee regularly report to work. *See Tyndall,* 31 F.3d at 213 ("[A] regular and reliable level of attendance is a necessary element of most jobs."). Regardless of how exceptional an employee's skills, he cannot meet his employer's expectations, legitimate or otherwise, if he does not report to work. Because Plaintiff had not shown up for work for approximately seven months when his employment was terminated, he cannot now claim that he was meeting his employer's legitimate expectations. This Court therefore finds that Plaintiff has failed to establish the third element of his prima facie case.

As to the fourth element of Plaintiff's prima facie case, that he show that his termination occurred under circumstances that raise an inference of unlawful discrimination, Plaintiff has failed to present any such information to the Court. In fact, Plaintiff's Brief poses the question whether Defendant terminated Plaintiff because of his disability, yet leaves this critical question unanswered. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 8.) Plaintiff simply identifies the final element of his prima facie case without giving any evidentiary information for its support. Plaintiff thereafter continues on with his *McDonnell Douglas* analysis as if Defendant's discriminatory animus was unquestionable. The Court notes, however, that the information in the record does not

---

8. Plaintiff, citing a portion of Dr. Monroe's deposition testimony, also claims that Defendant could have modified Plaintiff's job assignments and work hours to reduce his stress level. The Court notes, however, that this accommodation would only have been applicable after Plaintiff returned from his self-determined indefinite leave. Therefore, to the extent that Plaintiff's additional suggestions for an accommodation accompany his request for an indefinite leave, they are also unreasonable accommodations.

The Court also notes that Dr. Monroe's deposition testimony does not necessarily lend support to Plaintiff's position, as posited by Plaintiff. In fact, Dr. Monroe suggests that Plaintiff was never in a condition where he could work with any level of consistency or regularity. Specifically, after stating that Plaintiff might have been able to occasionally work in a room by himself with no supervisor, Dr. Monroe stated that Plaintiff was at no time in a condition where he could regularly work without being a danger to those around him. (Dr. Monroe Dep., at 71.)

suggest that Defendant acted in a discriminatory fashion toward Plaintiff. Rather, Defendant sent Plaintiff multiple letters asking him to explain why he was missing work. Moreover, Defendant tolerated Plaintiff's absence for approximately seven months before ultimately terminating Plaintiff's employment. Therefore, given that Plaintiff has provided no evidence regarding the final element of his prima facie case, and the information available to the Court indicates that Defendant was quite tolerant of Plaintiff's extended absence and dealt with it in a reasonable manner, this Court now finds that Plaintiff has not shown that his termination occurred under circumstances that raise an inference of unlawful discrimination. As a result, Plaintiff has also failed to establish the fourth element of his prima facie case.

■ In sum, the Court notes that Plaintiff has only fulfilled one of the four requisite elements of his prima facie case. Furthermore, even if the Court was to assume that Plaintiff had established his prima facie case, Plaintiff's ADA claim would nonetheless fail. The failure of Plaintiff's ADA claim would be eminent because Plaintiff has provided no basis upon which to find that Defendant's asserted reason for terminating his employment was a pretext for discrimination. As stated above, the legitimate nondiscriminatory basis for terminating Plaintiff's employment provided by Defendant was job abandonment. By raising job abandonment as the basis for Plaintiff's termination, Defendant has satisfied its burden of production to proffer a legitimate nondiscriminatory basis for its employment action. For Plaintiff to proceed with his ADA claim, then, he must demonstrate that Defendant's proffered reason is a pretext for disability discrimination. The only evidence of pretext presented by Plaintiff, however, is that he "was performing the position and could

have continued at least by December, 1998." (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 8.) Plaintiff's reference to December, 1998 appears to be an error, as it does not relate to the time-frame under which Plaintiff's alleged disability and absences from work occurred. Nevertheless, even if the Court accepts December, 1999 as the month to which Plaintiff was referring, for that month conforms with Plaintiff's claim that he could have eventually returned to work, it remains irrelevant to the issue of whether his November 26, 1999 termination was motivated by his alleged disability. Moreover, Plaintiff's claim that he was performing adequately prior to the onset of his alleged disability does not evidence pretext in light of the fact that immediately prior to his termination, Plaintiff stayed out of work for months without a medical excuse. Therefore, even if Plaintiff's prima facie case was adequate, he has failed to show pretext, as required under the *McDonnell Douglas* framework. In any event, this Court finds that Plaintiff has failed to establish three of the four requisite elements of his prima facie case. This Court, therefore, further finds that there is no genuine issue of material fact with respect to whether Defendant discriminated against Plaintiff on the basis of his disability in violation of the ADA and that Defendant is entitled to judgment as a matter of law. As such, Defendant's Motion for Summary Judgment with respect to Plaintiff's ADA claim is GRANTED and Plaintiff's claim for disability discrimination under the ADA is hereby DISMISSED.

D.   Plaintiff's Claim for Intentional Infliction of Emotional Distress

In conjunction with his federal claims, Plaintiff also asserts a North Carolina state law claim for intentional infliction of emotional distress. Prior to addressing the merits of this claim, though, the Court

must consider a preliminary matter raised by Defendant—that Plaintiff's claim for intentional infliction of emotional distress is preempted by ERISA. With certain specific exceptions, "ERISA preempts 'any and all [s]tate laws insofar as they may now or hereafter relate to any employee benefit plan' governed by ERISA." *Powell v. Chesapeake & Potomac Tel. Co. of Va.*, 780 F.2d 419, 421 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986) (quoting 29 U.S.C. § 1144(a)). In *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the United States Supreme Court interpreted ERISA's preemption clause in its broadest sense, holding that "[a] law relates to an employee benefit plan ... if it has a connection with or reference to such a plan." *Id.* at 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (internal quotation marks omitted). In applying *Shaw,* the Fourth Circuit has held that any state law, regardless of its source, that is invoked by a beneficiary claiming relief for injuries arising out of the administration of an employee benefit plan relates to such plan, and, absent a specific exception, is preempted by ERISA. *Powell,* 780 F.2d 419, 421.

■ It is clear that state law claims of intentional infliction of emotional distress which are based on the allegedly wrongful denial or termination of benefits under an ERISA plan are preempted by ERISA. *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1480 (4th Cir.), *cert. denied,* 519 U.S. 810, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996). As Defendant admits, Plaintiff's claim of intentional infliction of emotional distress is based on three incidents:

1) the treatment Plaintiff received while seeking disability coverage;

2) the Disability Center's decision to not consider Dr. Monroe's evaluation; and

3) Plaintiff's ultimate termination.

(Def.'s Mem. Supp. Mot. Summ. J., at 16.) The first two identified incidents clearly relate to the Disability Plan, as they are directly tied to Plaintiff's ability to qualify for coverage under the plan.

It is not entirely clear, however, whether the third incident involving the ultimate termination of Plaintiff's employment is related to the Disability Plan. The Eleventh Circuit has held that a claim for intentional infliction of emotional distress that arises out of the plaintiff's termination is not preempted by ERISA. *Clark v. Coats & Clark, Inc.,* 865 F.2d 1237, 1243–44 (11th Cir.1989). Moreover, in *Carter v. Times–World Corp.,* 149 F.3d 1167, 1998 WL 276456, (4th Cir.1998) (unpublished opinion), the Fourth Circuit recognized *Clark,* ultimately declining to decide the preemption question because it was not clear whether the plaintiff's claim for intentional infliction of emotional distress was based on a termination of the plaintiff's benefits or a termination of the plaintiff's employment. *Id.,* 1998 WL 276456, at *3, 149 F.3d 1167. Although this Court is aware that *Carter* was an unpublished opinion, and therefore provides only persuasive authority, it appears that the decision was well reasoned.

Of course, the situation in the instant case is a bit different from that in *Clark,* where the Eleventh Circuit was influenced by the fact that the plaintiff offered no indication that his termination was causally connected with his benefit plan. *Clark,* 865 F.2d at 1243–44. In the instant case, although Plaintiff does not contest Defendant on the issue of whether summary judgment is proper as to his state law claims, it appears that Plaintiff remained out of work because he felt that he was disabled, and therefore qualified for disability benefits. If that is the case, then the Disability Plan must be considered in determining whether Plaintiff's termi-

nation was justified. Therefore, despite the Fourth Circuit's apparent approval of *Clark*, the circumstances under which Plaintiff was terminated suggest that his claim for intentional infliction of emotional distress may be preempted by ERISA because Plaintiff's claim that he was disabled under the Disability Plan and ultimately terminated due to such disability led to his claim of intentional infliction of emotional distress. The Court need not fully decide the preemption question, however, because assuming, without deciding, that Plaintiff's claim for intentional infliction of emotional distress falls outside of the preemption provision of ERISA, summary judgment in favor of Defendant would nonetheless be proper on the merits of Plaintiff's claim.

In order to state a claim for intentional infliction of emotional distress, Plaintiff must show that Defendant engaged in extreme and outrageous conduct which was intended to, and in fact did, result in severe emotional distress. *Holloway v. Wachovia Bank & Trust Co.*, 339 N.C. 338, 351, 452 S.E.2d 233, 240 (1994); *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). With respect to the first element, the Court notes that extreme and outrageous conduct is defined as an action that exceeds all bounds usually tolerated by a decent society. *Stanback v. Stanback*, 297 N.C. 181, 196, 254 S.E.2d 611, 622 (1979); *Watson v. Dixon*, 130 N.C.App. 47, 52, 502 S.E.2d 15, 19 (1998). In conjunction with Plaintiff's ERISA claim, the Court determined that the Disability Center acted reasonably in denying Plaintiff's claim for disability benefits and in not accepting Dr. Monroe's effort to make a retroactive diagnosis of Plaintiff's condition in April, May, and June, 1999. That same conclusion is applicable in this context as well. Because Dr. Norton's records indicated that Plaintiff was not disabled during April, May, and June, 1999 and Plaintiff did not visit Dr. Monroe until July 23, 1999, the Disability Center had a reasonable basis for denying Plaintiff's claim for disability benefits. Similarly, because Plaintiff missed work for many months without a medical excuse, Defendant acted reasonably in determining that Plaintiff's abandonment of his job supported Defendant's termination of Plaintiff's employment. It cannot be said, then, that Defendant's conduct in this regard amounted to extreme and outrageous conduct as defined under North Carolina law. Defendant's decisions to deny Plaintiff's claim for benefits and terminate Plaintiff's employment were supported by clear reasoning and cannot support a claim for intentional infliction of emotional distress. Because Plaintiff cannot establish this critical element of his claim for intentional infliction of emotional distress, there is no genuine issue as to any material fact with respect to whether Defendant intentionally inflicted emotional distress upon Plaintiff and Defendant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Therefore, regardless of the preemption issue, Plaintiff has failed to state a claim for intentional infliction of emotional distress. Defendant's Motion for Summary Judgment with respect to Plaintiff's North Carolina State law claim for intentional infliction of emotional distress is therefore GRANTED and Plaintiff's claim for intentional infliction of emotional distress is hereby DISMISSED.

E. Plaintiff's Claim for Negligent Infliction of Emotional Distress

In the alternative to his claim for intentional infliction of emotional distress, Plaintiff alleges a claim for negligent infliction of emotional distress. Notably, Plaintiff's negligent infliction of emotional distress claim is based on the same conduct as his intentional infliction of emotional

distress claim, that is, Plaintiff's assertion of Defendant's improper treatment of Plaintiff in his efforts to seek disability benefits, the Disability Center's decision to discount Dr. Monroe's evaluation, and the circumstances surrounding Plaintiff's ultimate termination. Of course, Defendant again argues that summary judgment is proper because Plaintiff's negligent infliction of emotional distress claim is preempted by ERISA. With respect to Defendant's preemption argument, the Court notes that the same principles, discussed above in conjunction with the preemption of Plaintiff's claim for intentional infliction of emotional distress, are applicable in this context as well. *Carter*, 1998 WL 276456, at *3, 149 F.3d 1167 (unpublished opinion) (drawing from preemption cases that dealt with intentional infliction of emotional distress and applying them in the context of a claim for negligent infliction of emotional distress). As with Plaintiff's claim for intentional infliction of emotional distress, regardless of the preemption question, summary judgment is proper because Plaintiff has failed to establish a claim for negligent infliction of emotional distress on the merits.

▆▆▆ To state a claim for negligent infliction of emotional distress, Plaintiff must present evidence that Defendant negligently engaged in conduct, that it was reasonably foreseeable that such conduct would cause Plaintiff severe emotional distress, and that the conduct did, in fact, cause Plaintiff severe emotional distress. *McAllister v. Ha*, 347 N.C. 638, 645, 496 S.E.2d 577, 582–83 (1998); *Best v. Duke Univ.*, 337 N.C. 742, 752, 448 S.E.2d 506, 511 (1994). With respect to the first element, that Defendant negligently engaged in conduct, the Court notes that Plaintiff has presented no indication that Defendant acted negligently. In fact, Plaintiff did not even respond to Defendant's Motion for Summary Judgment with respect to his claim for negligent infliction of emotional distress. Despite Plaintiff's failure to address his claim for negligent infliction of emotional distress, the Court will consider Plaintiff's claim that Defendant engaged in negligent conduct.

▆▆▆ As stated previously, in support of his claim of negligent infliction of emotional distress, Plaintiff relies on the same three incidents that he relied upon in support of his claim for intentional infliction of emotional distress. Specifically, those incidents are:

1) the treatment Plaintiff received while seeking disability coverage;

2) the Disability Center's decision to not consider Dr. Monroe's evaluation; and

3) Plaintiff's ultimate termination.

With respect to the first incident, the treatment Plaintiff received while seeking disability coverage, it is important to note that Plaintiff was afforded multiple levels of review with respect to the denial of his claim for disability benefits, each of which was denied on reasonable grounds. Plaintiff also visited Dr. Norton on several occasions; after each visit, Dr. Norton concluded that Plaintiff was not suffering from a disabling condition. The Court, therefore finds that the Disability Center was not negligent in handling Plaintiff's request for disability benefits. In consideration of the second incident, the Disability Center's decision to not accept Dr. Monroe's evaluation, this Court has already determined that it was reasonable for the Disability Center to conclude that the results of Dr. Monroe's July 23, 1999 evaluation were not relevant to the question of Plaintiff's alleged disability during the months of April, May, and June, 1999. The Court, therefore, also finds that the Disability Center was not negligent in discounting Dr. Monroe's evaluation and recommendations. Finally, with respect to the third incident,

that is, Plaintiff's ultimate termination, the Court notes that Defendant only terminated Plaintiff after he had missed work for many months without a sufficient medical reason. In fact, the record indicates that prior to terminating Plaintiff's employment, Defendant sent Plaintiff multiple letters inquiring about Plaintiff's absence, and requesting that he return to work. These letters were apparently met with no response from Plaintiff. Plaintiff, therefore, cannot now claim that Defendant was negligent in terminating his employment. In fact, Defendant reasonably relied upon Plaintiff's abandonment of his job as the basis for his termination.

In sum, the Court notes that none of the three bases for Plaintiff's claim of negligent infliction of emotional distress indicate that Defendant engaged in negligent conduct. In fact, as discussed above, the record suggests the opposite conclusion. This Court therefore finds that Plaintiff has failed to establish that Defendant engaged in negligent conduct. Because Plaintiff cannot establish this critical element of his claim for negligent infliction of emotional distress, there is no genuine issue of material fact with respect to whether Defendant negligently inflicted emotional distress upon Plaintiff. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548, 2552. Therefore, regardless of the preemption question, Defendant is entitled to judgment as a matter of law. *Martin v. Nationwide Mut. Ins. Co.,* No. 1:99CV0956, 2001 WL 604192, at *12–*13 (M.D.N.C. April 20, 2001) (granting summary judgment where there was no evidence of negligence). As such, Defendant's Motion for Summary Judgment with respect to Plaintiff's claim for negligent infliction of emotional distress is GRANTED and Plaintiff's claim for negligent infliction of emotional distress is hereby DISMISSED.

### F. Plaintiff's Bad Faith Claim

Plaintiff also seeks a sum in excess of $10,000.00, claiming that Defendant acted in bad faith in denying his claim for disability benefits. Plaintiff has not, however, cited any statute or case law in support of his claim. The Court can only assume that Plaintiff is relying on North Carolina state law to establish bad faith as an aggravating factor in support of his claim that Defendant improperly withheld his disability benefits. The Court notes, though, that it has already determined that Defendant acted reasonably in denying Plaintiff's disability claim. Additionally, the Court notes that Plaintiff relied solely on the denial of his disability claim to support his claim for bad faith. As such, his bad faith claim clearly relates to the Disability Plan and, to the extent that it exists, is therefore preempted by ERISA. *Powell v. Chesapeake & Potomac Tel. Co. of Va.,* 780 F.2d 419, 421 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). Because Plaintiff's claim is preempted by ERISA, there is no genuine issue of material fact remaining. Defendant's Motion for Summary Judgment with respect to Plaintiff's claim for bad faith is therefore GRANTED and Plaintiff's bad faith claim is hereby DISMISSED.

### G. Plaintiff's Request for Punitive Damages

Because the Court has granted summary judgment in favor of Defendant with respect to each of Plaintiff's claims, there is no cause of action remaining upon which an award of punitive damages could be granted. As such, Plaintiff's request for punitive damages is moot and is therefore DISMISSED.

### IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment

[Document # 19] is GRANTED and all of Plaintiff's claims against Defendant are hereby DISMISSED.

An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.