Roscoe R. DUNBAR, Jr., Plaintiff,

v.

ORBITAL SCIENCES CORPORATION
GROUP DISABILITY PLAN

and

Liberty Life Assurance Company
Of Boston, Defendants.

No. CIV.H–01–2013.

United States District Court,
D. Maryland.

March 18, 2003.

Theodore P Stein, Theodore P Stein PC, Rockville, for Roscoe R. Dunbar, Jr., Plaintiff.

Henry Mark Stichel, Gohn Hankey and Stichel LLP, Baltimore, Jenny C Wu, Paul Hastings Janofsky and Walker LLP, John P. Isa, Paul Hastings Janofsky and Walker LLP, Washington, DC, for The Orbital Sciences Corporation Group Disability Plan, Orbital Sciences Corporation, Liberty Life Assurance Company of Boston, Defendants.

## MEMORANDUM OPINION

HARVEY, Senior District Judge.

In this civil action, plaintiff Roscoe Dunbar, Jr. ("Dunbar") is seeking to recover benefits under his employer's disability plan which was insured by defendant Liberty Life Assurance Company of Boston ("Liberty Life"). Suit has been brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et. seq. In a claim filed with defendant Liberty Life, plaintiff asserted that he had become totally disabled during the period of his employment with Orbital Sciences Corporation ("Orbital"), and he applied first for short term benefits and later for long term benefits under Orbital's plan which was insured by defendant Liberty Life. When his claims were denied, plaintiff sued defendants Liberty Life, Orbital Sciences Corporation Group Disability Plan ("the Plan"), and Orbital in this Court, seeking a declaratory judgment and benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). Plaintiff's claims against defendant Orbital have been resolved, and defendant Orbital has been dismissed from the case.

Presently pending before the Court are a motion for summary judgment[1] filed by plaintiff Dunbar and a motion for summary judgment filed by defendants Liberty Life and the Plan. Memoranda and voluminous exhibits have been submitted by the parties in support of and in opposition to the pending motions. A hearing has been held in open Court. For the reasons stated herein, plaintiff's motion for partial summary judgment will be denied, defendants' motion for summary judgment will be granted in part and denied in part, and the case will be remanded to Liberty Life, the plan administrator, for further consideration of plaintiff's claims.

## I

### Background Facts

Plaintiff Dunbar began his employment with Orbital on April 24, 1989. Orbital is in the business of building, programming and launching satellites. Plaintiff was employed as a scientist and had a lead role in the design and testing of support hardware and software for satellites and satellite sub-systems. As an employee of Orbital, Dunbar was a participant in the Orbital Sciences Corporation Group Disability Plan which was established pursuant to ERISA and which provided, inter alia, short term and long term disability benefits for employees. Orbital had purchased from Liberty Life a "group disability income policy" which is a part of the Plan, and it is that policy ("the Policy") which is at issue here. Liberty Life is the plan administrator.

Over the years, plaintiff Dunbar has experienced a number of medical problems. Since 1968, Dunbar has been on medication for high blood pressure. After experiencing a myocardial infarction in 1981, he had open heart, by-pass surgery in 1984. In 1995, he was treated for depression by a psychiatrist. In 1997, after suffering with nausea, joint pain, fatigue and depression, Dunbar was diagnosed with Hepatitis C. He has had bilateral cataract surgery and has suffered from significant osteoarthritis, particularly in his hips.

On December 18, 1998, Dunbar submitted a Family Medical Leave Request to Orbital, on which he checked a box indicat-

---

1. Although plaintiff does not characterize his motion as one for "partial" summary judgment, a review of the motion reveals that plaintiff is seeking summary judgment only as to Count I of the complaint. Plaintiff's pending motion will therefore be treated herein as a motion for partial summary judgment.

ing that he was seeking leave because of "a serious health condition that makes employee unable to perform the job." On that same day, Dunbar filed with defendant Liberty Life an application seeking disability benefits.[2] In his application, plaintiff characterized his medical conditions as Hepatitis C, short term memory loss and narcolepsy.

Following receipt of plaintiff's claim, Liberty Life instituted procedures for investigating its validity.[3] Charles DeVito ("DeVito"), an employee of Liberty Life with the job title of claims analyst, obtained medical records from physicians listed by plaintiff Dunbar in his claim and worked with him and his doctors to obtain additional information and current test results. On several occasions, DeVito requested that Orbital provide Liberty Life with job performance evaluations for Dunbar, but none were ever supplied to Liberty Life.[4] Thereafter, Liberty Life forwarded all the medical records which it had obtained to Dr. Cynthia Nichols, a sleep medicine specialist. After reviewing those records, Dr. Nichols concluded that the evidence in Dunbar's file was not sufficient for a diagnosis of narcolepsy. Dunbar's file was then sent to Kelly Brooks ("Brooks"), an employee of Liberty Life with the job title of claims manager 2, for review. Brooks reviewed the entire file and determined that Dunbar was not disabled within the meaning of the Policy and was not entitled to short term disability benefits. She so advised Dunbar by letter dated July 6, 1999. On that same day, Dunbar was placed on leave by Orbital pursuant to the Family and Medical Leave Act. The last day which Dunbar worked for Orbital was July 5, 1999, and his employment was subsequently terminated on September 28, 1999.

Represented by counsel, Dunbar filed an appeal of Liberty Life's denial of short term disability benefits. The appeal letter claimed that Dunbar should have been evaluated for cognitive disorder in addition to narcolepsy. Liberty Life again gathered additional information relevant to Dunbar's claim so that it might evaluate his claim in light of the alleged cognitive disorder. After receiving the raw data from the neurological testing which had been previously performed on Dunbar, Liberty Life sent Dunbar's enhanced file to Dr. Peter Mosbach, a clinical psychologist, for an independent peer review. Dr. Mosbach reviewed the file and spoke with Dr. Lynch, who had performed the earlier neuropsychological tests on Dunbar. Dr. Mosbach concluded that Dunbar did not suffer from any cognitive or memory deficits which would prevent him from working as a scientist. In a letter written by Chuck Johnson ("Johnson"), an appeal review consultant, Liberty Life denied Dunbar's appeal on January 31, 2000.

Dunbar then retained new counsel who wrote to Liberty Life requesting a full and fair review of Liberty Life's denial of short term disability benefits and requesting payment of long term disability benefits. Attached to the letter were several additional pieces of evidence, including a detailed neuropsychological report from Dr. Robert Kane, other additional medical re-

---

**2.** Although plaintiff submitted a claim for disability benefits on December 18, 1998, he continued to work at Orbital for several more months.

**3.** Although the disability claim form did not ask the claimant to indicate whether his claim was for short term or long term disability benefits, Liberty Life treated Dunbar's claim as one seeking short term disability benefits.

**4.** The claim file in this case is 478 pages in length but does not contain Orbital's job evaluations of Dunbar which have been submitted as exhibits in this case.

ports, a memorandum from Dunbar's former supervisor at Orbital and various affidavits. In a series of letters, Liberty Life informed Dunbar that his short term disability claim had been closed, that no further action would be taken as to that claim, but that his claim for long term disability benefits would be considered.

Dunbar's long term disability claim was reviewed by Brooks, the same person who reviewed his short term disability claim. On October 2, 2000, Liberty Life denied Dunbar's claim for long term disability benefits. Brooks' letter explained that Dunbar was not eligible for long term disability benefits because he had not satisfied the Elimination Period in the Policy, which requires that a claimant be disabled during the entire 180 day period following the last day he worked. Dunbar again appealed Liberty Life's decision. The appeal was handled by Lisa Jellerson ("Jellerson"), an appeal review consultant employed by Liberty Life. In reviewing Liberty Life's denial, Jellerson not only considered the fact that Dunbar had not satisfied the Elimination Period, but also undertook to review the claim file in its entirety. Following such review, Jellerson concluded that the medical information contained in the file confirmed that Dunbar was not disabled. With respect to Dr. Kane's report, she concluded that because that report was based on tests performed on August 5 and 6, 2000, it did not support a finding that Dunbar was disabled throughout the 180 day Elimination Period. On February 14, 2001, Liberty Life denied Dunbar's appeal.

On July 9, 2001, plaintiff Dunbar filed a three count complaint in this Court. In Count I, plaintiff seeks a judgment declaring that he is entitled to both short term and long term disability benefits. In Count II, plaintiff seeks a recovery for breach of fiduciary duty, and in Count III, he asserts a claim for breach of contract. Plaintiff asks the Court to enter an Order requiring Liberty Life and the Plan to pay him benefits in the amount of $181,833.50, and also to enter a declaratory judgment awarding him long term disability benefits in the amount of $5,042.85 per month through June 10, 2003. Prejudgment interest and attorneys' fees are also sought.

## II

### Summary Judgment Principles

It is well established that a party moving for summary judgment or partial summary judgment bears the burden of showing the absence of any genuine issue of material fact and that the movant is entitled to judgment or partial summary judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). The movant's burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. *Id.* The burden is on the moving party at the summary judgment stage to show that there is an absence of evidence to support the nonmoving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985), when the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.'" *Barwick*, 736 F.2d at 958–59 (quoting

*Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548).

Applying these principles to the facts of record here, this Court has concluded that plaintiff's motion for partial summary judgment must be denied, that defendants' motion for summary judgment must be granted in part and denied in part, and that this case must be remanded to Liberty Life, the plan administrator, for further consideration.

### III

#### *Applicable ERISA Principles*

Principles applicable in a suit like this one brought under ERISA were enunciated by the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In that case, the Supreme Court held that a denial of benefits challenged in a suit brought under § 1132(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. If discretionary powers are given to the administrator or fiduciary under the plan, its decisions are reviewed for abuse of discretion and will not be disturbed if they are reasonable. *Id.*

The Fourth Circuit has developed a "well-settled framework" for review by a court of a fiduciary's denial of benefits claimed under an ERISA plan. *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir.1997). As an initial matter, the reviewing court must determine *de novo* whether the ERISA plan confers discretionary authority on the administrator or fiduciary and if so, whether the administrator or fiduciary acted within that discretion. *Id.* at 233; *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir.1996).

If the reviewing court decides that the particular plan at issue vests in its administrator or fiduciary discretion to determine a claimant's eligibility for benefits, a deferential standard is to be applied. Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *Ellis*, 126 F.3d at 232; *see Bruch*, 489 U.S. at 115, 109 S.Ct. 948; *Haley*, 77 F.3d at 89. The decision of an administrator or fiduciary is reasonable if it is " 'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.' " *Ellis*, 126 F.3d at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir.1997)).

In support of the claims asserted by him in this case, plaintiff contends that a substantial factor which the Court must consider is that defendant Liberty Life, acting as the fiduciary here, had a conflict of interest when it denied his claim for benefits. Plaintiff points out that Liberty Life's exercise of discretion had a direct

financial effect on its profitability and that Liberty Life's resulting conflict of interest must be weighed as a factor in determining whether there has been an abuse of discretion. *See Bruch,* 489 U.S. at 115, 109 S.Ct. 948. The Fourth Circuit has also established "a well-developed framework" for consideration by a reviewing court of a conflict of interest of the sort existing in this case. *Ellis,* 126 F.3d at 233. A court must apply the conflict of interest factor on a case-by-case basis in order to lessen the deference normally given under the applicable discretionary standard of review. *Id.* However, deference should be lessened only to the extent necessary to counteract any influence unduly resulting from such conflict of interest. *Id.* In *Bedrick v. Travelers Ins. Co.,* 93 F.3d 149, 152 (4th Cir.1996), the Court, harmonizing *Bruch* and Fourth Circuit law and quoting *Bailey v. Blue Cross and Blue Shield of Virginia,* 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996), said the following:

> [W]hen a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

■ In *Ellis,* the Fourth Circuit emphasized that, even if a conflict of interest existed, a court should nevertheless "in no case" deviate from the abuse of discretion standard. 126 F.3d at 233. Rather, the approach to be taken should be as follows:

> Instead, the court modifies that abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Id.*

Applying these principles, this Court must determine on the record in this case whether Liberty Life's review process was thorough and evinced a deliberate, principled reasoning process and also whether its decision was based on substantial evidence. *Id.* at 234. Presented with a case like this one in which the fiduciary has a conflict of interest, this Court must review the merits of the plan administrator's decision to determine whether it was consistent with an exercise of discretion by a fiduciary, acting free of the interests which would conflict with those of the beneficiary. *Id.* at 233; *Bedrick,* 93 F.3d at 152.

## IV

### *Discussion*

#### (a)

#### *Standard of Review*

■ Plaintiff first contends that this Court should review Liberty Life's denial of benefits under the *de novo* standard enunciated in *Bruch.* Express language of the Liberty Life policy does not support this contention.

Section 7 of the Policy provides in pertinent part, as follows:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit

eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

The language in question clearly confers discretionary authority on Liberty Life as the fiduciary to determine Dunbar's entitlement to benefits under the policy. Indeed, the language in the Liberty Life policy is similar to that which was before the Court in *Ellis*, in which case both the parties and the Court agreed that the fiduciary's denial of benefits should be reviewed under an abuse of discretion standard. 126 F.3d at 233; *see also Thomas v. Liberty Life Assur. Co. of Boston*, 226 F.Supp.2d 735, 742 (D.Md.2002).

This Court further concludes that Liberty Life's decision must in this case be analyzed under the modified abuse of discretion standard. Liberty Life has a conflict of interest in this case because the Policy is self-funding in that any payments for short and long term benefits are made directly by Liberty Life.[5] The approach which this Court must follow in a case of this sort is that outlined in both *Bedrick*, 93 F.3d at 152, and *Ellis*, 126 F.3d at 233–34. In view of the conflict of interest factor which exists in this case, this Court will review the decision of Liberty Life to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. 93 F.3d at 152, 126 F.3d at 233–34.

(b)

*Short Term and Long Term Disability Benefits Under the Policy*

Under the Policy purchased by Orbital, an employee becomes eligible for short term disability benefits starting on the eighth day of continuous disability resulting from injury or sickness. An employee is considered disabled for purposes of short term disability if he is unable to perform all of the material and substantial duties of his occupation. The maximum payout period for short term disability benefits is twenty-five weeks. If Dunbar's short term disability claim had been approved, he would have received twenty-five weeks of coverage beginning in July 1999.

Pursuant to the Policy, an employee becomes eligible for long term disability benefits either after 180 days of continuous disability or at the end of his short term disability benefits, whichever is greater.[6] Under the Policy, an employee is considered disabled during the first twenty-four months of long term disability if he is unable to perform all of the material and substantial duties of his occupation. After twenty-four months of the payment of long term disability benefits, the test becomes stricter, and it is required that the employee be unable to perform, with reasonable continuity, all of the material and substan-

---

**5.** Defendants contend that a reduction in deference is not appropriate in this case. Defendants argue that any conflict between Liberty Life's role as decisionmaker verses its role as insurer is negligible because the value of Dunbar's claim in the context of Liberty Life's overall financial operation is *de minimis*. However, the Fourth Circuit has never accepted such an argument and has regularly applied the modified abuse of discretion standard in cases where a plan administrator is also the plan's insurer, regardless of the value of the plaintiff's claim in relation to the defendant's financial operation. *See e.g., Booth v.*

*Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir.2000) (applying the modified abuse of discretion standard in a case where the plaintiff's claim would certainly have been considered *de minimis* in the context of the plan administrator's overall financial situation).

**6.** This period of time for which the employee must be disabled but for which no benefit is payable is known as the "Elimination Period."

tial duties not only of his own but also of any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity. If Dunbar's long term disability claim had been approved, he would have started receiving long term disability benefits beginning on January 10, 2000. In order for Dunbar to have continued receiving benefits after December 2001, he would have needed to satisfy the stricter definition of disability.

### (c)

### *Denial of Short Term Disability Benefits*

### (i)

### *Deliberate Principled Reasoning Process*

Pursuant to the dictates of *Ellis,* this Court must first determine whether Liberty Life's decision to deny Dunbar's short term disability claim was based on a deliberate, principled reasoning process. In the disability claim form submitted by him on December 18, 1998, Dunbar had asserted that he was totally disabled because of Hepatitis C, short term memory loss and narcolepsy.

■ At the outset of its investigation, Liberty Life, through DeVito, obtained medical records from a number of Dunbar's doctors. Shortly after obtaining these records, DeVito faxed a request to Orbital to complete a physical job evaluation form for Dunbar, noting on the request that Orbital should also forward recent job performance reviews for the past two to three years. According to DeVito's handwritten notes, Orbital received his fax and informed DeVito that it would provide the requested information. However, Liberty Life never received from Orbital any performance evaluations of Dunbar, and Liberty Life never notified Dunbar that Orbital had failed to forward the requested information.

After obtaining a substantial number of medical records, Liberty Life's in-house nurses and doctors began reviewing Dunbar's claim. One of the in-house nurses, Susan Terry, noted:

Subsequent to this testing [a second round of sleep tests], if there are normal sleep patterns & MSLT [Multiple Sleep Latency Test] is not clearly abnormal, we will need results of a complete repeat neuropsychological evaluation and testing if there are persistent cognitive problems.

Following these initial reviews of plaintiff's claim, DeVito obtained additional information from Dunbar's doctors and informed Dunbar that additional sleep studies needed to be performed in order to properly assess his claim. Dunbar promptly complied with DeVito's request and underwent additional sleep testing, the results of which were forwarded to Liberty Life.

The complete Dunbar file was then sent to Dr. Cynthia Nichols, a sleep medicine specialist, for outside peer review. Liberty Life asked Dr. Nichols in particular to determine whether the results of Dunbar's most recent sleep tests supported a diagnosis of narcolepsy. After reviewing all of the records, Dr. Nichols concluded that "neither the clinical or polysomnographic evidence are sufficient for a diagnosis of narcolepsy in this patient" and that the most likely explanation for Dunbar's excessive daytime sleepiness was a decrease in nocturnal sleep.

In a four-page letter to Dunbar dated July 6, 1999, Brooks denied plaintiff's claim for short term disability benefits based on a review of the information contained in Dunbar's file. Brooks concluded that there was no objective evidence to support a diagnosis of narcolepsy or an impairment due to Dunbar's sleep habits and that Dunbar was receiving treatment

for Hepatitis C. Dunbar was told that if he disagreed with the determination made, he should advise Liberty Life in writing, setting forth his objections.

By letter dated September 3, 1999, an attorney for plaintiff appealed Liberty Life's denial of short term benefits. The letter explained that Dunbar should have been evaluated for cognitive disability in addition to narcolepsy. Attached to that appeal were letters from Dr. Satinsky and Dr. Lynch reaffirming that Dunbar's claim was based upon cognitive impairment and not narcolepsy. Dr. Satinsky had concluded that "Dunbar can no longer carry out the duties of his job," and Dr. Lynch had concluded that Dunbar's "cognitive defects were both permanent and severe, impacting on Dunbar's ability to perform his job."

After receiving Dunbar's appeal, Liberty Life again reviewed Dunbar's entire file to determine whether his alleged cognitive impairment rendered him disabled. A representative of Liberty Life wrote to Dunbar explaining that it needed the raw data from the neuropsychological testing performed on him in 1998. Dunbar promptly forwarded the requested data to Liberty Life. Following receipt of the raw data, Dunbar's complete file was sent to Dr. Peter Mosbach, a clinical psychologist, for outside peer review. Liberty Life asked Dr. Mosbach to determine in particular whether the results of the neuropsychological tests performed on Dunbar indicated that he could no longer perform his job. After reviewing Dunbar's claim file and speaking with Dr. Lynch over the telephone, Dr. Mosbach concluded that the test scores did not reveal any cogni-

tive or memory deficits that would prevent Dunbar from working as a scientist. Dr. Mosbach found that one test, the Test of Variables of Attention ("TOVA"), showed impaired results, but that those results appeared to be the product of an invalid test administration.

On January 31, 2000, Liberty Life denied plaintiff's appeal. Johnson's letter of denial stated that Liberty Life's decision was based on Dr. Mosbach's conclusion that there were no cognitive or memory deficits that would prevent Dunbar from working as a scientist. That letter does not explain why Liberty Life chose to disregard the numerous medical reports and letters written by Dr. Satinsky, by Dr. Katon, and by Dr. Lynch, all of whom had concluded that Dunbar's cognitive impairment rendered him totally disabled.[7] The January 31, 2000 letter of denial went on to state that:

> Although Dunbar reports he experiences some symptoms, the medical documentation, including the neuropsychological test results, do not support limitations, either cognitively or from narcolepsy, preventing him from performing the material and substantial duties of his occupation as a Scientist. Therefore, in the absence of medical documentation to support total disability, he does not meet the definitions under the terms of the Orbital Sciences' policy and no benefits are payable.

Although Liberty Life had conducted a thorough review of Dunbar's initial claim for short term disability benefits, that review had focused primarily on plaintiff's alleged narcolepsy.[8] In her letter denying

---

7. There is no mention of Dr. Katon's report in the letter. Although Johnson does note in his letter that there is medical information in the file from Dr. Satinsky and Dr. Lynch, he does not mention that both of these reports conclude that Dunbar's cognitive impairment rendered him totally disabled.

8. On his disability claim form, Dunbar stated that he suffered from narcolepsy, Hepatitis C and short term memory loss. He never spe-

the claim, Brooks had listed each piece of medical evidence supplied by Dunbar and had explained why it did not support a finding that Dunbar was disabled within the meaning of the Policy. However, by way of contrast, in reviewing Dunbar's appeal based on the assertion that he suffered from a cognitive disorder, Johnson failed to explain why the opinions of plaintiff's treating physicians could not be credited and failed to discuss in any way how plaintiff's alleged cognitive impairment might relate to his job requirements. This Court accordingly concludes that the decision reached by defendant Liberty Life in denying plaintiff's appeal was not the result of a deliberate, principled reasoning process. *See Laser v. Provident Life Accident Ins. Co.*, 211 F.Supp.2d 645, 655 (D.Md.2002) (finding abuse of discretion where plan administrator, *inter alia*, failed to consider all of plaintiff's medical evidence and failed to relate plaintiff's maladies to his job).

By way of plaintiff's appeal, Liberty Life had been informed that Dunbar was seeking disability benefits based on his alleged cognitive impairment and not on his alleged narcolepsy. Upon receipt of plaintiff's appeal, Liberty Life undertook an investigation to determine whether Dunbar's alleged cognitive impairment prevented him from working as a scientist. At the time, plaintiff's claim file already included medical reports and other documentation from two of Dunbar's treating doctors and from a treating neuropsychologist, all of whom had concluded that plaintiff's cognitive impairment disabled him from performing his job. The opinions of Dunbar's treating doctors were based primarily on a neuropsychological

screening performed by Dr. Lynch in 1998 and on various personal evaluations of Dunbar at various times by each doctor. Following an initial review of these records, DeVito requested and obtained the raw data from the neuropsychological testing performed on Dunbar in 1998. A second independent peer review was then performed by Dr. Mosbach who concluded that the raw data from the neuropsychological testing did not show any cognitive or memory deficits that would prevent Dunbar from working as a scientist.

After reviewing the file again, Liberty Life denied plaintiff's appeal. The decision of Liberty Life denying the appeal was based on the conclusions of Dr. Mosbach. No attempt was made in defendant's letter of denial of January 31, 2000 to discuss, explain or distinguish the opinions of Dunbar's three treating physicians, all of whom had concluded that plaintiff's cognitive impairment rendered him disabled from performing his job. Indeed, the letter erroneously stated that there was "an absence of medical documentation to support total disability." In conclusory terms, the letter stated that the medical documentation including the neuropsychological test results "do not support limitations, either cognitively or from narcolepsy, preventing him from performing the material and substantial duties of his occupation as a Scientist." Had Liberty Life employed a deliberate reasoning process, it should have at least, after noting the existence of medical evidence supporting Dunbar's claim of cognitive impairment, discussed the opinions of Dunbar's treating doctors and explained why they were afforded no weight. By completely ignoring the findings and conclusions of plaintiff's

cifically stated that he was suffering from cognitive impairments. Liberty Life understandably assumed that his memory problems were connected to his alleged narcolepsy and

thus focused its initial review on that alleged ailment and not on any cognitive impairments.

treating physicians and instead basing its denial solely on the opinion of an independent consultant who did not examine or interview Dunbar, Liberty Life did not employ a deliberate, principled reasoning process and thereby did not comply with the first part of the modified abuse of discretion standard.

Defendants contend that the Fourth Circuit has not adopted the so-called "treating physician rule"[9] and that Liberty Life therefore did not abuse its discretion in accepting the conclusions of Dr. Mosbach and ignoring those of Dunbar's treating doctors. Defendants are correct that the Fourth Circuit has not indicated that the "treating physician rule" should be applied in an ERISA case. *Laser,* 211 F.Supp.2d at 655; *see Elliott,* 190 F.3d at 607. Thus, it is not an abuse of discretion for a plan fiduciary to deny benefits where conflicting medical reports were presented. *Elliott,* 190 F.3d at 607. However, "that does not mean a plan administrator is free to entirely ignore a treating physician's opinion." *Laser,* 211 F.Supp.2d at 655. Evidence of record indicates that this is not a case where the plan administrator reviewed, considered, and distinguished conflicting medical reports and ultimately chose to accept the conclusions of an independent medical examiner over those of the claimant's treating doctor. Instead, Liberty Life chose to disregard without discussion the opinions of three of plaintiff's treating doctors and instead accepted the opinion of a single independent consultant.

Another significant deficiency in Liberty Life's decision-making process was its failure to obtain job performance evaluations. Orbital conducted yearly performance appraisals of plaintiff Dunbar including the years 1996 through 1998. Although requested, these appraisals were never obtained by Liberty Life during their review of Dunbar's disability claims. They were, however, turned over to plaintiff's counsel during discovery and have been attached as exhibits to plaintiff's motion for partial summary judgment. In each appraisal, plaintiff received an overall performance rating and also a rating in each of the following five areas: communication, quality, dependability, planning and leadership.

A review of the appraisals indicates that from 1996 to 1998, Dunbar's performance steadily deteriorated. In the 1996 appraisal, Dunbar received ratings of "excellent" or "fully satisfactory" in each area, earning him an overall rating of "fully successful." In the 1997 appraisal, plaintiff's rating in each area and his overall rating had slipped to "satisfactory." In the 1998 appraisal, his performance rating slipped even further as reflected by an overall rating of "needs improvement." His communication and leadership skills were rated in 1998 as "satisfactory," but his planning and quality were rated as "needs improvement," and his dependability was rated as "unacceptable." It was noted in the 1998 appraisal that "Ron's ongoing medical problems may or may not have contributed to his lack of performance and if they were the primary or a contributing factor, he should take whatever steps are necessary to resolve the performance issue."

Defendants argue that Liberty Life had no duty to obtain Dunbar's job performance evaluations and that they would have been irrelevant in any event because the determination of disability is a medical

---

**9.** The "treating physician rule" requires the fact finder to defer to "the expert judgment of a physician who has observed the claimant's medical condition over a prolonged period of time ... absent *persuasive contradictory evidence." Laser,* 211 F.Supp.2d. at 655 (*quoting Elliott,* 190 F.3d at 607). (Emphasis in original).

determination. This Court must disagree. Contrary to defendants' contention, job evaluations would clearly have been helpful in evaluating Dunbar's claim because Section 2 of the Policy defines "disability" in relation to the claimant's ability to perform his job.[10] *See e.g. Laser*, 211 F.Supp.2d at 656 (criticizing plan administrator for failing to relate plaintiff's reported maladies to his job where policy defined disability in relation to claimant's ability to perform his job). Moreover, the actions and statements of Liberty Life's own representatives show that job evaluations are relevant in evaluating a disability claim. DeVito himself had requested job performance evaluations from Orbital, and Brooks testified at her deposition that job evaluations are an important piece of evidence in evaluating a disability claim. Yet they were never received and considered by Liberty Life when the decision was made to deny Dunbar's appeal.

Furthermore, after Orbital failed to send the evaluations to Liberty Life as it had promised to do, Liberty Life should have informed Dunbar that job evaluations would have been helpful in evaluating his claim and that Orbital had failed to respond to DeVito's request. By failing to so inform Dunbar, he was denied the opportunity to contact Orbital on his own and obtain the evaluations. Liberty Life's failure to inform Dunbar is particularly significant inasmuch as Dunbar was quite cooperative throughout the entire review process and often assisted Liberty Life in securing needed medical records and data.

Plaintiff also argues that Liberty Life's review of his claim was flawed because Liberty Life did not have him examined by an independent medical examiner to further evaluate his cognitive disorder.

Plaintiff contends that in failing to order an independent medical examination, Liberty Life ignored the recommendation of Nurse Terry that a complete neuropsychological evaluation be performed on Dunbar. There is no merit to this argument.

When Nurse Terry wrote her note suggesting that there be an independent neuropsychological examination, Liberty Life was in the early stages of its evaluation of Dunbar's claim. At that time, Liberty Life did not have the raw data from the neuropsychological testing which was performed on Dunbar in 1998. Following Dunbar's appeal, in which Dunbar contended that it was his cognitive disorder rather than his narcolepsy which rendered him disabled, Liberty Life informed Dunbar that they needed the results of a complete neuropsychological evaluation and asked him to obtain copies of the raw data from the testing which was performed in 1998. The raw data was then supplied. After receiving the requested raw data, Liberty Life sent Dunbar's file to Dr. Mosbach for an independent peer review and a determination whether the results of the prior neuropsychological tests indicated that Dunbar could no longer perform his job. Requiring Dunbar to undergo another independent medical examination after extensive data had been received and reviewed by Liberty Life's independent examiner would have been only minimally helpful in evaluating Dunbar's claim and would have been an undue burden on Dunbar.

### (ii)

### *Substantial Evidence*

■ Although the Court has concluded that the decision of Liberty Life denying Dunbar's appeal was not the result of a

---

**10.** Section 2 defines "disability" with respect to short term disability coverage as occurring when a claimant cannot perform "all of the material and substantial duties of his occupation ... because of an Injury or Sickness."

deliberate, principled reasoning process, the Court cannot on the record here determine as a matter of law that the decision was not based on substantial evidence. Even though Liberty Life's denial was based solely on Dr. Mosbach's conclusion that there were no cognitive or memory deficits that would prevent Dunbar from working as a scientist, such a result would not necessarily constitute an abuse of discretion. Nevertheless, Liberty Life's total reliance on Dr. Mosbach's report is somewhat suspect in view of the fact that plaintiff's claim file contained documents from two treating doctors and a treating neuropsychologist, all of whom had concluded that plaintiff's cognitive impairment rendered him disabled from performing his job.

Following a neuropsychological screening of Dunbar in 1998, Dr. Lynch had concluded that Dunbar's "inconsistent performance, particularly on tests of attention, suggests that his underlying physiological problems may be interfering with his overall cognitive functioning." She recommended that Dunbar contact his medical physicians for further exploration of the problem. Dr. Lynch later opined that Dunbar's cognitive impairment was permanent and rendered him disabled. Dr. Satinsky, a specialist in neurology who treated Dunbar for his cognitive disorder, submitted reports on three separate occasions between November 1998 and August 1999 concluding that Dunbar's cognitive and memory deficits rendered him permanently disabled and prevented him from working as a scientist. At the request of Liberty Life, Dr. Satinsky also completed a mental status functional capacities form on which he indicated that Dunbar's work-related activities and mental status were significantly restricted. On January 12, 1999, Dr. Katon wrote a report in which he stated that he had evaluated Dunbar several times over the prior few months and that he concurred with Dr. Satinsky's assessment that based on his cognitive deficits, Dunbar was and would remain disabled in terms of his employment.

Liberty Life based its appeal decision solely on the opinion of Dr. Mosbach, and it did not consider other relevant medical evidence. It did not consider significant evidence relating to appraisals of Dunbar's job performance. These appraisals indicated that Dunbar's performance had steadily deteriorated during the years preceding his request for an award of short term disability benefits. Moreover, as noted hereinabove, Liberty Life failed to address and consider the opinions of plaintiff's treating physicians, all of whom concluded that plaintiff's cognitive impairment prevented him from working for Orbital as a scientist.

As in *Laser*, this is the type of ERISA case which should be remanded to the administrator for further consideration.[11] Although the Fourth Circuit has cautioned that "remand should be used sparingly," *see Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir.1985) and *Elliott*, 190 F.3d at 609, the Court noted in *Elliott* that remand is a most appropriate course where the plan administrator had not considered relevant and available information. *Id.*

■ In deciding under the modified abuse of discretion standard whether the administrator's decision was reasonable,

11. The Court is satisfied that, even though it might on the record here be within the Court's discretion to reverse the administrator's decision, this is an appropriate case for remand because the evidence does not indicate that the administrator committed clear error or acted in bad faith. *See, e.g., Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 789 n. 6 (4th Cir.1995); *Laser*, 211 F.Supp.2d at 657 n. 24.

this Court cannot consider evidence which was not before the plan administrator. *Bernstein,* 70 F.3d at 785; *Nessell v. Crown Life Ins. Co.,* 92 F.Supp.2d 523, 533 (E.D.Va.2000). As in *Bernstein,* the record before the administrator in this case at the time of the benefit determination "contained insufficient evidence to allow [this Court] to adequately review the denial of benefits." *Id.* Where, as here, a plan permits the recovery of short term benefits if the employee is not because of disability able to perform all of the material and substantial duties of his occupation, the employer's evaluations of the employee's performance of his job duties are highly relevant. Indeed, in this case, Liberty Life recognized the necessity of including such evaluations in the claim file and specifically requested Orbital to furnish them. However, the evaluations were not produced, and they were not considered by Liberty Life when it made its decision to deny benefits. The plan administrator therefore did not have before it a complete evidentiary record. As the Fourth Circuit stated in *Berry,* the case where a remand is "strongest" is where readily available relevant evidence, although in existence, was not before the administrator and where the administrator had agreed to consider that evidence but did not do so. 761 F.2d at 1008. That is exactly what occurred here.

On remand, Orbital's evaluations of Dunbar's job performance in the years prior to the filing of his claims for short term benefits should be reviewed by the plan administrator. In addition, Liberty Life should on remand consider the opinions of plaintiff's treating doctors which were not discussed in its decision denying Dunbar's appeal. Since defendant Liberty Life did not have before it Orbital's job evaluations and since it disregarded the opinions of Dunbar's treating physicians, it is not clear from the record here that

defendant Liberty Life had before it substantial evidence supporting its denial of benefits. Following remand, Liberty Life should conduct a new and more searching review of plaintiff's claims for both short term and long term benefits and should issue a new benefits determination. *See Laser,* 211 F.Supp.2d at 657.

(d)

*Denial of Long Term Disability Benefits*

■ Plaintiff Dunbar has also challenged Liberty Life's decision denying Dunbar's claim for long term disability benefits. The Court must therefore also determine here whether that decision was based on a deliberate, principled reasoning process and whether it is supported by substantial evidence.

On August 22, 2000, plaintiff's attorney wrote to Liberty Life requesting a full and fair review of Liberty Life's denial of short term disability benefits and also requesting that Liberty Life consider Dunbar's claim for long term disability benefits. Attached to the letter were, *inter alia,* a neuropsychological evaluation report by Dr. Robert Kane based on a neuropsychological examination performed on August 5 and 6, 2000, a report from Dr. Robert Eisendorfer explaining that Dunbar was symptomatic for Hepatitis C, a memorandum from Dunbar's former supervisor at Orbital, and affidavits from Dunbar, his wife and a co-worker. After some initial confusion on the part of the parties concerning the status of Dunbar's claim and concerning whether Dunbar needed to file a separate long term disability claim, Liberty Life informed plaintiff's attorney that Dunbar's short term disability claim had been closed, but that his claim for long term disability would be considered.

Plaintiff's long term disability claim was also handled by Brooks. In a letter to Dunbar dated October 2, 2000, Brooks

denied plaintiff's claim for long term disability benefits. Brooks concluded that Dunbar was not eligible for long term disability benefits because his claim for short term benefits had been denied and because he therefore had not satisfied the so-called Elimination Period of the Policy. Before Dunbar could under the policy receive long term disability benefits, he had to show that he was disabled during the entire 180 day Elimination Period following the last day that he worked. It is apparent that defendant's decision denying long term disability benefits was based solely on the fact that Dunbar had failed to satisfy the Elimination Period requirements.

By letter dated November 11, 2000, plaintiff's attorney appealed Liberty Life's denial of long term benefits. The appeal was handled by Lisa Jellerson ("Jellerson"), an appeal review consultant with Liberty Life. Jellerson reviewed the entire claim file, including the information attached to the August 22, 2000 appeal letter. She did not, however, have plaintiff's file reviewed by a Liberty Life medical expert nor by an independent consultant. In a four-page letter to Dunbar dated February 14, 2001, Jellerson denied plaintiff's appeal. Jellerson concluded that the medical documentation in Dunbar's file did not establish that Dunbar was disabled throughout the Elimination Period or that his alleged impairments prevented him from performing the material and substantial duties of his job. With respect to Dr. Kane's report, she concluded that because the report was based on tests performed on August 5 and 6, 2000, it did not support a finding that Dunbar was disabled during the entire 180 period following the last day that he worked.[12]

It is apparent that the decision-making process employed by Liberty Life in considering Dunbar's long term disability claim was influenced by Liberty Life's prior denial of Dunbar's short term disability claim. The only medical evidence in Dunbar's claim file addressing his cognitive impairment which was not before Liberty Life during its review of Dunbar's short term disability claim was Dr. Kane's report. But that report was more than a year after Dunbar's last day of work. Medical reports prepared substantially after the relevant date of disability are of little relevance in determining whether a claimant is disabled. *See Starnes v. General Elec. Co.,* 201 F.Supp.2d 549, 556–57 (M.D.N.C.2002) (holding that plan administrator acted reasonably in affording no weight to an evaluation dated three months after the date plaintiff claimed he became disabled); *see also Robinson v. Phoenix Home Life Mut. Ins. Co.,* 7 F.Supp.2d 623, 631–32 (D.Md.1998). After concluding that Kane's report did not support a finding that Dunbar was disabled on the last day that he worked, Brooks and Jellerson were left with the same file which Liberty Life had reviewed less than a year earlier in considering and denying Dunbar's claim for short term disability benefits.

Since this Court has decided to remand to the plan administrator Dunbar's claim for short term disability benefits so that a new determination can be made of his right to receive such benefits, the Court must also remand his claim for long term benefits. The two claims are directly related. Under the circumstances, there is no need for the Court to determine here whether Liberty Life's decision denying Dunbar's long term disability claim was

---

**12.** There was confusion concerning the last day that Dunbar worked. Jellerson's letter stated that Dunbar's last work day was either March 5, 1999 or July 7, 1999. It is now clear that Dunbar's last work day was on or about July 5, 1999.

based on a deliberate, principled reasoning process and whether it was supported by substantial evidence.

#### (e)
#### Counts II and III [13]

■ In Count II, Dunbar asserts that defendants breached their fiduciary duties to plaintiff in violation of Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). The Supreme Court has recognized that in certain circumstances a beneficiary under an ERISA plan may sue a plan administrator for breach of fiduciary duty, but that the remedy is limited to "appropriate relief." *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). "[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515, 116 S.Ct. 1065.

In *Dwyer v. Metropolitan Life Ins. Co.*, 4 Fed.Appx. 133, 142 (4th Cir.2001), the Fourth Circuit held that where a plaintiff is entitled to seek relief under ERISA for the wrongful denial of disability benefits, claims against a plan administrator for breach of fiduciary duty are foreclosed. In *Dwyer*, the plaintiff brought suit against an ERISA plan administrator alleging, *inter alia*, wrongful denial of disability benefits under ERISA and breach of fiduciary duty. *Id.* at 134. With respect to the plaintiff's breach of fiduciary duty claim, the Court affirmed the district court's grant of summary judgment for the defendant, explaining that the plaintiff had not identified any defect in the relief already granted under ERISA which would make additional equitable relief appropriate. *Id.* at 142.

Because Dunbar is entitled to seek relief in this case under ERISA for the denial of disability benefits and since he has not here identified any defect in the relief granted herein by the Court, his claim for breach of fiduciary duty is foreclosed. Accordingly, this Court will grant defendants' motion seeking summary judgment as to Count II of the complaint.

■ In Count III, Dunbar asserts a claim for breach of contract. However, ERISA preempts state law claims for breach of contract like that asserted by Dunbar in Count III of his complaint. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Plaintiff argues that he is entitled to proceed with Count III because a court may re-characterize a state law breach of contract claim as one for benefits under an ERISA plan. *See Bedrick*, 93 F.3d at 151. Plaintiff's argument has no merit. Because plaintiff has already alleged an ERISA claim in this case, converting his breach of contract claim into one for ERISA benefits would be pointless. Accordingly, this Court will grant defendants' motion seeking summary judgment as to Count III of the complaint.

### V

#### Conclusion

For all the reasons stated, this Court will remand plaintiff's claims to Liberty Life, the plan administrator, for the conduct of a review of his short term disability claim and also of his long term disability claim. A new and more searching review should be made by Liberty Life of these two claims, and new determinations should

---

**13.** Plaintiff's memoranda contain no extended discussion of the merits of Counts II and III. In a footnote on the last page of those memoranda, plaintiff has stated that he will dismiss Counts II and III without prejudice if summary judgment is entered in his favor as to Count I.

be made concerning plaintiff's right to receive the benefits claimed. In particular, Liberty Life should obtain and consider Orbital's job performance evaluations of plaintiff Dunbar and should consider other relevant evidence in the claim file. Liberty Life may seek an independent analysis of plaintiff's medical records if it determines that such an analysis is necessary. *See Pappas v. Reliance Std. Life Ins. Co.,* 20 F.Supp.2d 923, 928 n. 15 (E.D.Va.1998) (explaining that on remand a plan administrator may consider additional evidence).

Accordingly, plaintiff's motion for partial summary judgment will be denied, and defendants' motion for summary judgment will be granted in part and denied in part. Plaintiff's claims will be remanded to defendant Liberty Life, the plan administrator, for further consideration. An appropriate Order will be entered by the Court.

### ORDER

For the reasons stated in the Court's Memorandum Opinion of today, it is this *18th* day of March, 2003 by the United States District Court for the District of Maryland,

ORDERED:

1. That plaintiff's motion for summary judgment, treated herein as a motion for partial summary judgment, is hereby denied;

2. That defendants' motion for summary judgment is hereby granted in part and denied in part;

3. That plaintiff's claims for both short term and long term disability benefits are hereby remanded to defendant Liberty Life Assurance Company of Boston, the plan administrator, for further consideration; and

4. That the Clerk is directed to close this case.